POOR, ADMINISTRATOR, ET AL., APPELLANTS, *v.* MADISON RIVER POWER CO. ET AL., RESPONDENTS.

(No. 2,627.)

(Submitted January 14, 1908.  Decided February 15, 1909.)

[99 Pac. 947.]

*Master and Servant — Personal Injuries — Death—Complaint— Sufficiency — Independent Contractors—Vice-principal—Fellow-servants—Electricity—Assumption of Risk—Contributory Negligence—Directed Verdict—Error.*

Personal Injuries—Relation of Master and Servant—Complaint—Sufficiency.
    1.  Where the gravamen of the complaint in an action to recover damages from an electric power company for the death of a carpenter, employed by it to make repairs in and about its power station, was that defendant failed in its duty to use ordinary care to furnish deceased a reasonably safe place in which to work, allegations that deceased had been "employed and hired" by defendant, and was "engaged in the performance of his duty under his employment," etc., were sufficient to show that the relation of master and servant existed between defendant and deceased.

Same—Independent Contractors—Servants.
    2.  The superintendent of an electric power company engaged a carpenter to do certain work about the company's power station, and directed the latter to secure another workman to help him. The understanding was that they were to be paid by the hour. The officers of the company pointed out what work was required and the company furnished the materials.  The general plans were those of defendant company, and the workmen submitted themselves to the control of the company and its officers in all the details

of the work. *Held*, that the carpenters were servants and not inde-pendent contractors.

Same—Vice-principal—Fellow-servants.

3. The superintendent of an electric power company in charge of its power station and of the improvements and alterations being made thereon at the time plaintiff's intestate, a carpenter, was killed by coming ·in contact with an uninsulated wire, was a vice-principal and not a fellow-servant.

Same—Contributory Negligence—Complaint—Sufficiency.

4. The complaint in an action to recover damages for the death of an employee of an electric power company, which alleged that decedent, a carpenter, was engaged in the performance of his duty; that he accidentally lost his footing, and in an attempt to prevent his falling, and not knowing that a wire was charged with electricity, threw his arm over it; that he was inexperienced with electric wires, did not know that the wire was charged with electricity and that the place where he was working was unsafe because of the danger of his coming in contact with wires; that defendants had knowledge of the danger and negligently failed to inform decedent thereof—sufficiently showed the latter's freedom from negligence in the doing of the act which caused his death, and a formal allegation that he was free from contributory negligence was not necessary.

Same—Extraordinary Danger—Assumption of Risk.

5. A servant does not assume the risk of extraordinary danger of which he has no knowledge or appreciation.

Same—Knowledge of Defendant—Complaint—Sufficiency.

6. The complaint mentioned in paragraph 4 above, also *held* suffi-cient in its statement of facts showing wherein the danger con-sisted, and the causal connection between the defective place and the injury, as well as that the defendants had knowledge of the efficient cause of the injury, or, by the exercise of reasonable dili-gence, ought to have had such knowledge.

Same—Evidence—Contributory Negligence—Insufficiency.

7. Where a carpenter accidentally slipped on a scaffolding in an electric power station, and in doing so threw his arm over a wire heavily charged with electricity, evidence held not to justify a holding that, as a matter of law, deceased was guilty of con-tributory negligence.

Same—Electricity—Assumption of Risk.

8. A carpenter who, while working about the power station of an electric power company, had been informed by the superintendent in charge that there was no danger in working around the electric wires, and who, on the strength of such statement, walked over and crawled up around them while engaged in his work and was sub-sequently killed by coming in contact with one of them, did not as-sume the risk of danger from the wires.

Same—Directed Verdict—Error.

9. *Held*, that the district court erred in directing a verdict in favor of defendant electric company, in an action to recover damages for the negligent killing of one of its employees.

*Appeal from District Court, Gallatin County; Henry L. Myers, Judge, presiding.*

ACTION by J. R. Poor, administrator of Amos R. Howerton, deceased, and others, against the Madison River Power Com-

pany and another.   Judgment for defendants, and plaintiffs appeal from it and an order denying them a new trial.   Reversed and remanded.

Statement of the Case, by the Justice Delivering the Opinion.

Those portions of the complaint in this action which are necessary to be considered in disposing of the appeal are as follows: ''That on or about the twenty-third day of January, 1907, the defendant Madison River Power Company was the owner of a certain building known as its 'substation,' situated near the western limits of the city of Bozeman, county of Gallatin, state of Montana, and of all electrical apparatus, devices, appliances, and wires situated therein; that on said twenty-third day of January, 1907, and at the time of the injuries hereinafter mentioned, the said Amos R. Howerton, deceased, was employed and hired by the defendant Madison River Power Company as a carpenter for the purpose of making certain improvements and alterations within and upon the said substation building of the defendant Madison River Power Company, under the direction of the defendant A. E. Davidson, who was at said time the superintendent or foreman of the defendant Madison River Power Company, and in charge of said substation and of the improvements and alterations therein and thereon being made at said time, upon which the said Amos R. Howerton, deceased, was so employed; that the said Amos R. Howerton, deceased, was employed by the defendant Madison River Power Company by the day, and had been engaged on said work for a period of about one week prior to the said twenty-third day of January, 1907, except for several days during said period, when such work was interrupted by reason of cold weather.   That on said twenty-third day of January, 1907, and at the time of the injuries hereinafter mentioned, there was within said substation building a certain brickwork rising to a height of about twelve feet from the floor of said building; that about a foot back from the edge of said brickwork, and at a height of about eighteen or twenty inches from the top edge of said brickwork,

there was a wire carrying electric current from the power plant of the defendant Madison River Power Company, situated on the Madison river, in Madison county, Montana, which said wire entered said substation at the west end thereof, and passed into said substation, and delivered electric current into certain transformer pockets encased and erected in and upon the said brickwork, which said current was therein transformed to a lower voltage, to be carried by other wires into the city of Bozeman, to supply light and power for domestic uses to consumers in said city of Bozeman; that at the said time the said wire was charged with and carrying an electric current of about 40,000 volts of electricity, and that said wire was wholly uninsulated and unprotected. That between the hours of 7 and 9 o'clock on the morning of the said twenty-third day of January, 1907, the said Amos R. Howerton, deceased, while engaged in the performance of his duty under his employment with defendant Madison River Power Company, as aforesaid, was working as a carpenter in said substation building under the direction of the said A. E. Davidson, and was engaged in constructing certain 'horses' to be used as a part of and for the purpose of erecting a staging or scaffolding to enable the said Amos R. Howerton, deceased, to make certain improvements or alterations near the roof on the inside of the said substation building at a point almost directly over and above the said brickwork and above said wire; that while so engaged, and after having constructed the said 'horses,' and placed the same in position about two or three feet distant from the said brickwork, and while engaged in placing boards or planks on top of said 'horses,' so that the same would run from one of said 'horses' to the other for the purpose of completing said staging or scaffolding, and to form a place where he might stand while engaged in making such improvements or alterations near the roof of said building, as aforesaid, and while the said Amos R. Howerton, deceased, was standing at or near the top of one of the 'horses,' and while his body was in a position almost on a level with the edge of said brickwork and close to the said wire above mentioned, the said Amos R. Howerton, deceased, accidentally lost his footing,

and in an attempt to prevent his falling from said height to the floor below, and not knowing that the same was charged with electricity, threw his right arm over the said wire, which threw his body over in such a way as to cause it to come in contact with said brickwork, thereby forming a circuit and causing the full current of electricity with which the said wire was charged to pass through the body of the said Howerton, as a result of which said electric shock the said Howerton instantly died. That the said Howerton, deceased, by reason of his inexperience with electric wires and devices, did not know that the said wire which caused his death, as aforesaid, was charged with electricity, and did not know that the said place where he was working was dangerous and unsafe because of the danger of his coming in contact with wires charged with electricity; that the defendant wrongfully and negligently failed to inform said Amos R. Howerton, deceased, that the said wire which caused his death was charged with electricity, or of the danger in which he was placed because of the fact that there were wires charged with electricity in dangerous quantity in close proximity to the place where said Howerton was working as aforesaid. That the said defendants had knowledge and notice of said conditions and of said dangers, or by the exercise of reasonable diligence could have had knowledge and notice thereof. That it was the duty of the defendants to use reasonable and ordinary care, to the end that the place where they had said Howerton working for them be reasonably safe and free from danger, and that it was the duty of the defendants to keep the said place where the said Howerton was working free from danger while the said Howerton was complying with the directions and commands of the defendants; but that the said place so furnished the said Howerton to do the work aforesaid was not a safe place, but, on the contrary, and by reason of the facts aforesaid, the same was a highly dangerous place, and because of the existence of said electric wires charged with electricity, as aforesaid, in close proximity to the place where said Howerton was working, the defendants failed in their duty to keep and maintain the said location where the said Howerton was then working free from

danger, and that by reason of the failure of the defendants to furnish the deceased Howerton a reasonably safe place in which to perform his labor, and their failure to keep the same free from danger, the said Howerton was killed.''

The defendants filed a general and a special demurrer to the complaint, which demurrers were by the court overruled; whereupon they filed an answer, wherein they admitted the allegations of the complaint as to the conditions, location, connections, uses, and purposes of the wires and transformer pockets therein mentioned, and that the same were uninsulated and could not be insulated, and that the same were unprotected, except that the wire was located so far above the floor of the substation that it was impossible for anyone to come in contact with it while using ordinary care; and alleged, first, that Howerton ''had the entire control and direction of the work he was employed to perform, and that he devised the plans for the same and directed and controlled the performance of the same in all its details''; second, with the exceptions of a few immaterial admissions, the defendants denied all other material allegations of the complaint; and, third, for a separate defense, they alleged: ''That the death of Howerton was caused solely and only by his own negligence and carelessness contributing directly thereto, and not otherwise, and in this: That said Howerton was employed to devise and construct within said substation for the defendant Madison River Power Company a platform to extend from the east end of the top of the brickwork mentioned in the complaint to the east end of the substation building therein described, on which platform the wire mentioned in the complaint and two other wires, which were located on the top of the said brickwork and charged with 40,000 volts of electricity, were to be placed, and by it permanently supported and carried to the east end of said building, and thence through certain apertures in the east wall thereof prepared for that purpose; that pursuant to said employment said Howerton planned and devised said platform and its method of construction and erection, and between the hours of 7 o'clock A. M. and 9 o'clock A. M. of the twenty-third day of January, 1907, being about to proceed with the construc-

tion of the same, and having full knowledge of the dangerous character of said wires and all thereof, was warned by defendant Davidson not to go up in the course of said work where he might come in contact with said wire mentioned in the complaint, until he, the said Davidson, should turn off the current of electricity with which said wire was charged, and thereupon said Howerton stated to said defendant that his said work would not be sufficiently advanced to require him, the said Howerton, to go up where he might come in contact with said wire before about 3 o'clock in the afternoon of that day; and thereupon it was arranged between said Davidson and said Howerton that during the noon hour of said day said Davidson would turn off the current of electricity and turn said wire back so it would be safe for said Howerton to go up to the top of said brickwork in the progress of said work, and that said Howerton would not do so until said wire had been changed and turned back, and thereupon said Howerton proceeded with said work; and thereupon said Davidson, relying upon said arrangement, proceeded to work outside said substation, and about 9 o'clock A. M. of said day, while working alone in said substation, and notwithstanding said warning and arrangements for making it safe for him to go to the top of said brickwork, and before it was so made safe, and with full knowledge of the dangerous character of said wire and the danger of coming in contact therewith, the said Howerton carelessly and negligently, without the knowledge of defendants, or either of them, went up on a rough, temporary 'horse' for supporting certain temporary staging which he was building, about twelve feet high, which 'horse' he had constructed, and placed about three feet from the east end of said brickwork, mounting the same by means of boards which he had nailed on the west legs thereof so as to form a rough and unsafe ladder, and made use of the same in such manner as to bring himself near said wire mentioned in the complaint, and in some way to these defendants or either of them unknown he came in contact with said wire, and was immediately killed thereby. That said Howerton's death was caused by the contributory negligence of said Howerton him-

self; that said Howerton was employed as a carpenter to devise and construct a platform on which the wire mentioned in the complaint and two other wires in position on top of said brickwork were to be supported permanently and carried from the east end of said brickwork to the east end of said substation; that at the time of his employment he well knew, and was informed and warned, that said platform was to be built in said substation, and that said wires were located therein as in said complaint specified, and that the same were charged with electricity, and that it would be fatal to human life to come in contact with them, or any of them, but, notwithstanding such knowledge and information and warning, he accepted said employment, and freely and voluntarily entered upon the same with full knowledge of all the dangers attendant upon such employment. That, by reason of the premises, Howerton assumed the said risk of injury and death by reason of contact with electric wires charged with electricity so incident to the said employment, and his injury and death so received was not received or brought about by or through any neglect or default of the defendants, or either of them, but the same resulted from unforeseen and unavoidable accident, the risk of which the said Howerton assumed when he accepted said employment as aforesaid.'' The affirmative allegations of the answer were put in issue by the reply.

Those portions of the testimony which are material to the consideration of the appeal follow:

Frank McCabe, a witness for the plaintiff, testified as follows: ''I am a carpenter. The circumstances under which Mr. Howerton and I were employed were that Mr. Davidson came to me, and wanted me to go out and do some work, and we went and looked at it, and, as we were coming in, he says, 'You get another man,' and I got Mr. Howerton to help to do the work. Howerton didn't go with me to the office of the company. I didn't present him to any of the officers of the company. I think I told him we would go to work the next morning. I talked with Mr. Mendenhall, and he said, 'You go and get another man,' and I got him, and we went to work the next morn-

ing.  I expect we had worked there eight or ten days prior to
the twenty-third day of January.  Our work was continuous
during that time, but some days we put in only an hour and a
half or two hours a day.  It was so cold that we couldn't stand
it.  We were working outside putting a hood on this building.
While we were engaged in putting up that hood, we had to
work around the electric wires.  There were three or four wires
that came out of the east end of the building—those that come
downtown—and, when we first commenced the staging, we had
to keep building to get to our work, and finally, when we put
our staging under the wires, it would press them up, and we
put them on top and pressed them down, and I asked Mr. David-
son if there was any danger.  Howerton was present when this
conversation took place.  It was about 3 o'clock in the after-
noon, and he said: 'You fellows better lay off until Monday,
and I will run these wires out of the building and cut them.'
He at that time said there was no danger—to put the planks
on top of the wires.  We laid a plank on the wires, and he
finally said there might be danger if the boards were wet.  I
don't remember whether we stood on the plank after we put it
on the wires or not.  We built the lower staging; and I think
we left the lower staging, and went on up.  When we got the
second staging up, we got to that glass wire, and there was a
wire went out of the east of the building, and I told Mr. David-
son I was afraid of them, and he said there was no danger, and
we walked over and crawled up around them.  It was on the
22d, I think, Davidson told us to come back to work, no differ-
ence how cold it was.  We could work inside, there being a
stove there.  Nothing further was said by Davidson to Hower-
ton in my presence with reference to what we were to do the
next morning—only we would start that framework.  He had
explained to us previous to that what he wanted done up there.
I was present at the time of those explanations.  Our instruc-
tions were so complete as to enable us to go to work without his
being there.  On the morning of the 23d there was some work
to be done on the outside on the hood.  I sawed a one by four
half in two, and got it ready to put up, and Howerton went to

work making a 'horse.' He was working at the time right down here by this transformer-stall inside of the building. While I was getting this board ready, Howerton got the material in for his trestle. I helped him set that 'horse' up. I think the 'horse' must have been twelve feet high, and probably ten feet wide. When we got that 'horse' set up, during this time I had my work done, and there was some work out on the head of the hood, and I says: 'I'll go out and do my work, and you can stay in here.' While I was up on the ladder at work on the south end of the hood, I believe he came out. He came there and spoke to me, and I don't know what he done after that, because I was outside. After he went inside, from that time, maybe five or ten minutes—I don't know just now—but during the time Mr. Davidson had come out and gone south of where I was working, and directly we heard a racket inside like a plank slipping on this cement floor; and I heard Mr. Davidson say, 'My God!' and he started in the building and he says, 'There's a man on the wire,' and when I got in Mr. Davidson had been in and cut off the current, and we let him down onto the floor. Howerton was dead. When I first went into the building, I saw Howerton there on the wire. He had his arm around it. I think the wire was clear under his left arm. His hip was resting on this transformer. I would lack about three inches of reaching him when I went in. There was a space of about twelve or fourteen inches from this wire over to the edge of the brickwork. The end braces were not placed upon the end of the four-legged 'horses.' It just had the four legs on with cleats on for steps. Howerton and I generally both got there about the same time in the morning, and he and I were right close by one another that morning. During the time that Howerton was working there, Mr. Davidson was right down at the corner mixing up some cement. When I went outside to resume my work, Davidson was in the building, and I had not been out a great while until he came out himself. It was not over five minutes before the time that we all went in the building when Howerton was on the wire that Mr. Davidson came out. He was in the substation building within five min-

utes of the time that Howerton was found. When Mr. Davidson came out, he stood, I should say, about twenty-five feet from the door, in a position to look inside and see the brickwork. During the time that we were engaged at that building, I was working with Howerton all the time up until that morning."

In answer to the question, "Would it have been possible for Mr. Davidson to have expressed any warning to Howerton, or discussed with him the danger of any wires in the building without you knowing it?" the witness answered: "No, sir; I don't think he could have warned him, unless I would have heard him. I was working right close by Howerton the entire morning of the 23d up until I went out the last time. During that period of time no warning was expressed to Howerton, nor was the question of the danger of the wires in the building discussed with him. During the entire period of time that I have testified about, from the day I went to work there and during the periods of time that I was at work with Mr. Howerton up until the time I went out from the building, five or ten minutes before Howerton went on the wire, while I was in the presence and in the hearing of Howerton, there was nothing said or expressed on the question of the danger of the wires by Mr. Davidson or any other officer of the company. During that time while Howerton and I were together nobody had given us any intimation of the danger of the close proximity to the wires. Mr. Davidson was the foreman for the company. He was in charge of the Madison River Power Company's work which was being done on the building that morning by Howerton and me. Howerton was getting fifty cents an hour there at that time. The wires that we were working close to on the outside of the building were insulated wires, and Howerton and I had our hands on them. When Davidson employed me, he told me where he wanted me to work. He showed me what was to be done when we went there. He said he wanted a hood made. He and I figured out what would be required in the way of dimension lumber; that is, I told him what would be required and he did it. There was nothing said about pay. We were to be paid by the hour, we understood, when we worked there, and

we simply kept a charge for the hours we put in, and I think Mr. Davidson kept it too. It was on the 22d that the work was first pointed out to Howerton and me on the inside. Mendenhall and I had not talked about that when he employed me— just the hood. Davidson said he wanted a frame to hold that wire up on the transformer. He pointed out that they wanted brackets on the east end of the building and the bracket put up on the east end of the pocket or brickwork. He showed us how he wanted them put on and told us the dimensions, measurements, etc. He never gave any measurements. He just told Howerton and me in a general way and expected us to make measurements and fit the framework and things of that kind. He gave us no plans or specifications, but expected us men with our skill and experience to make the improvements. That is what we were expected to do. I knew that the low tension wires carried power downtown. I don't know that I knew at that time that the high tension wires were up on the top of that brickwork. I knew those wires were the high tension wires. I might have known those wires were dangerous, but I didn't know there were 40,000 volts. I am satisfied no warning could have been given without my knowing it. Before the accident or immediately after the accident, there were no diagonal crosspieces on this trestle. There were just the four on this leg and the one on the west leg. It would wobble a little, I expect. I did not help Howerton put the boards across the top of the two 'horses.' I didn't see that done. There were two boards clear across, and the third had fallen down. Two of these boards had been put across to the trestle that had been put against the wall on the other side, and the third board had evidently fallen while he was trying to put it on. The boards could be put up there very easily. One man could put them up. It might be wobbly, but I can put them up. As to whether putting those boards across there would cause that to weave back and forth, I will say that the weight of the boards would kind of strengthen the 'horse.' The weight of them would not strengthen them until they got fastened onto the other 'horse,' and

until that time they would be pretty wobbly. Howerton was a skillful carpenter. He was also a contractor.''

The foregoing is not all of the witness' testimony, but enough to illustrate the proposition hereinafter discussed.

The wife of the deceased testified that her husband, who was forty-two years of age, was not familiar with electricity or electrical devices and appliances, had never had any experience with the same, and had never worked around them.

At the close of plaintiff's case, the defendants interposed a motion for nonsuit, which was overruled. Whereupon the defendant Davidson was sworn as a witness. He testified: ''On the morning that Mr. Howerton made these two 'horses,' and while he was making them, we discussed the matter of his building two brackets, to go up on the east wall of the power house to hold a long sixteen-foot four by six that would carry three insulators to hold the wires up on that wall. He says: 'As soon as I finish these horses, I will go to framing up those brackets.' And I says, 'It will take you some time'; and he says, 'Oh, yes'; and I says, 'We can't do anything on this platform that we spoke about building, until we shut down at noon and take the current off and turn those wires back to the second insulators.' He then says: 'I won't have any occasion to go up there until 3 o'clock, as it will take me until that time framing those brackets.' I talked with him about those wires being dangerous. I says he must not go up there to do any work until the wires were turned back, so there would not be any danger of working up there. I don't know that I ever called his attention to those wires being dangerous before that time; had no occasion to, because they had never worked in proximity to those wires. He didn't at any time during the morning give me any notice of his having changed his intention and of his intention to go up there. When he stated that he would not go up there or have occasion to go up until 3 o'clock that afternoon, I believed what he said, and relied upon it. The wire that caused the death of Howerton has a covering on it, but the insulation, however, is no pro-

tection to a wire carrying that voltage. The conversation I had with Howerton of which I spoke could not have been more than fifteen minutes before he was killed. I think the four-legged 'horse' was about completed and in position when we were talking, because it was my impression he was going right to work at the bench framing up those two brackets that were to go on the wall. I think I testified at the coroner's jury that I did help Mr. Howerton set up one of those 'horses.' I may have helped to place the second horse in position."

This witness also testified that at the coroner's inquest he answered the following questions as follows: "Q. What precaution did you take, Mr. Davidson, to inform the men as to the dangers there? A. The verbal warning not to go near the wires. It is very well understood by all the men who work up there that it is dangerous to go near the wires, and not to go near them. Q. Are you sure you expressed the specific warning to Mr. Howerton? A. Yes, sir. Where these wires terminated, we were going to work up there, and I told him before we did anything I would shut the current down at noon, and turn these wires back, so there would not be any danger by going there whatever. Q. You told him that morning? A. I wouldn't say whether I told him this morning or last night, but it was understood we weren't to go up there to do any work until these wires were turned back."

The witness also testified that he was able to remember better after the lapse of thirteen months than he was at the time of the coroner's inquest, because Frank McCabe had testified positively it was not in his presence that the witness had made any such statements. The foregoing is not all of the testimony of the defendant Davidson, but sufficient for the purposes of this appeal.

At the close of all the evidence, the defendants separately and severally moved the court to direct the jury to return a verdict in their favor for the reasons set forth in the motion for nonsuit theretofore made, and for the additional reason that the testimony showed that Howerton was specifically warned by the defendant Davidson of the dangerous condition of the wire.

This motion was sustained, and under the direction of the court the jury returned a general verdict in favor of the defendants. Judgment was entered upon this verdict, and, from that judgment and an order denying his motion for a new trial, the plaintiff has appealed.

*Messrs. Walrath & Patten,* for Appellants.

The presumption obtained that deceased was in the exercise of due care until the contrary was shown either by the appellant's evidence or that of the respondents.    (*Ryan* v. *St. Louis Transit Co.,* 190 Mo. 621, 89 S. W. 865, 2 L. R. A., n. s., 777.) The burden of alleging and proving contributory negligence on the part of Howerton rested upon the respondents, unless the appellant's case raised a presumption of contributory negligence. (*Ball* v. *Gussenhoven,* 29 Mont. 321, 74 Pac. 871; *Nord* v. *Boston & M. Con. C. & S. Min. Co.,* 30 Mont. 48, 75 Pac. 681; *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45.)    There was no inference of negligence on Howerton's part from the mere fact that he threw his arm over the electric wire in his fall from the staging.    (*Birsch* v. *Citizens' Elec. Co.,* 36 Mont. 574, 93 Pac. 940.) Nor was there any inference of negligence from the fact that Howerton fell.    (*Stevens* v. *United Gas & Elec. Co.,* 73 N. H. 159, 60 Atl. 848, 70 L. R. A. 119; *Drown* v. *New England Tel. etc. Co.,* 80 Vt. 1, 66 Atl. 801.)

The circumstances shown by the appellant, aided by the presumption which the doctrine of *res ipsa loquitur* raises, made out a *prima facie* case to go to the jury.    (*Hardesty* v. *Largey Lumber Co.,* 34 Mont. 151, 86 Pac. 29; *McGowan* v. *Nelson,* 36 Mont. 67, 92 Pac. 40; *Benedick* v. *Potts,* 88 Md. 52, 40 Atl. 1067, 41 L. R. A. 478; *Griffin* v. *Manice,* 166 N. Y. 188, 82 Am. St. Rep. 630, 59 N. E. 925, 52 L. R. A. 922; *Jenkins* v. *St. Paul City Ry. Co.* (Minn.), 117 N. W. 931.)

The fact that a ''suspicion'' of negligence may attach to plaintiff does not relieve defendant of proving contributory negligence.    (*Gulf etc. Ry. Co.* v. *Shieder,* 88 Tex. 152, 30 S. W. 902, 28 L. R. A. 538.)    The duty was incumbent upon respondents

to warn Howerton of the danger, and unless they did so, the appellant was entitled to recover. (*Reeve* v. *Colusa G. & E. Co.,* 152 Cal. 99, 92 Pac. 89; *Millen* v. *Pacific Bridge Co.* (Or.), 95 Pac. 196; *Illinois Steel Co.* v. *Schymanowski,* 162 Ill. 447, 44 N. E. 876; *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45.)   Where the facts are uncertain it is error to direct a verdict. (*Paul* v. *Van Da VinJa,* 58 Hun, 611, 12 N. Y. Supp. 638; *Fitzgerald* v. *Hart* (Tex. Civ. App.), 23 S. W. 933.)   Nonsuits and directed verdicts must not be granted when there is anything to be left to the jury. (*Nord* v. *Boston etc. Min. Co.,* 30 Mont. 48, 75 Pac. 681; *Michener* v. *Fransham,* 29 Mont. 340, 74 Pac. 450.)   The weight of the evidence is a question for the jury. (*Ball* v. *Gussenhoven,* 29 Mont. 322, 74 Pac. 875; *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45; *Kroeger* v. *Passmore,* 36 Mont. 504, 93 Pac. 807, 14 L. R. A., n. s., 988.)   A case which fairly depends on the effect or weight of testimony should not be withdrawn from the jury unless the testimony be of such a conclusive character as to compel the court, in the exercise of a sound judicial discretion, to set aside a verdict returned in opposition to it. (*Phoenix Mut. L. Ins. Co.* v. *Doster,* 106 U. S. 30, 1 Sup. Ct. 18, 27 L. Ed. 65; *Montclair Township* v. *Dana,* 107 U. S. 162, 27 L. Ed. 436, 2 Sup. Ct. 403; *Connecticut Mut. Life Ins. Co.* v. *Lathrop,* 111 U. S. 612, 4 Sup. Ct. 533, 28 L. Ed. 536; *Gardner* v. *Michigan Cent. Ry. Co.,* 150 U. S. 349, 14 Sup. Ct. 140, 37 L. Ed. 1107.)

*Messrs. Hartman & Hartman,* and *Mr. J. L. Templeman,* for Respondents.

In a personal injury case, where the relation of master and servant is alleged in the complaint, and the proof shows the injured party to have been an independent contractor, there can be no recovery. (*Kansas C. & Mo. Ry. Co.* v. *Loosley,* 76 Kan. 103, 90 Pac. 990.)   The decision is based on the wellknown rule that the plaintiff must recover, if he recovers at all, upon the theory of his complaint.   The use of dangerous machinery, and the maintenance and operation of a dangerous

business, inherently so, is not necessarily negligence; nor is lack of guards or covers thereto, in the absence of proof that such protection was reasonable and practicable, and a servant who knows or ought to know that the very things which he voluntarily goes to work upon are dangerous assumes the risk. (1 Shearman & Redfield on Negligence, 195; *Lafflin* v. *Buffalo etc. R. Co.*, 106 N. Y. 136, 60 Am. Rep. 433, 12 N. E. 599; *McGuerty* v. *Hale*, 161 Mass. 51, 36 N. E. 682; *Young* v. *Burlington etc. Co.*, 79 Iowa, 415, 44 N. W. 693; *Arizona Lumber Co.* v. *Mooney*, 4 Ariz. 366, 42 Pac. 952.)

This court has held that where the evidence is of such a character that they would unhesitatingly grant a new trial on the ground of insufficiency of the evidence to sustain the verdict, or where there is a mere scintilla of evidence, or where the conclusion to be reached from the testimony is equally consistent with either of the issues to be proven, a verdict should be directed or the motion for nonsuit sustained. (*Shaw* v. *New Year Gold Mines Co.*, 31 Mont. 138, 77 Pac. 515; *Nord* v. *Boston & Montana C. C. & S. M. Co.*, 30 Mont. 48, 75 Pac. 681; *Cummings* v. *Helena & L. S. & R. Co.*, 26 Mont. 434, 68 Pac. 852; *McGowan* v. *Nelson*, 36 Mont. 67, 92 Pac. 40; *Howie* v̄. *California Brewing Co.*, 35 Mont. 264, 88 Pac. 1007; *Olsen* v. *Montana Ore Pur. Co.*, 35 Mont. 400, 89 Pac. 731; *Hardesty* v. *Largey Lumber Co.*, 34 Mont. 151, 86 Pac. 29; *Forquer* v. *Slater Brick Co.*, 37 Mont. 426, 97 Pac. 843.)

While contributory negligence is a defense, and must be pleaded, yet, if plaintiff's case shows contributory negligence, the burden is upon him to show no negligence on his part, and unless he does so, he must be nonsuited. (*Nord* v. *Boston & Montana C. C. & S. M. Co.*, *Cummings* v. *Helena & L. S. & R. Co.*, *Shaw* v. *New Year Gold Mines Co.*, *supra; Nelson* v. *Boston & Montana C. C. & S. M. Co.*, 35 Mont. 223, 229, 88 Pac. 785; *Nelson* v. *City of Helena*, 16 Mont. 21, 39 Pac. 905; 1 Shearman & Redfield on Negligence, 110; see, also, *Dingley* v. *Starr Knitting Co.*, 134 N. Y. 552, 32 N. E. 35; *Leonard* v. *Miami Min. Co.*, 148 Fed. 827, 78 C. C. A. 517; *Peterson* v. *Union Iron*

*Works,* 48 Wash. 505, 93 Pac. 1077; *Gardner* v. *Porter,* 45 Wash. 158, 88 Pac. 121; *Fritz* v. *Salt Lake Electric Co.,* 18 Utah, 493, 56 Pac. 90; *Armstrong* v. *Town of Cosmopolis,* 32 Wash. 110, 72 Pac. 1038; *Olmstead* v. *Hastings Shingle Mfg. Co.,* 48 Wash. 657, 94 Pac. 474.)

Deceased seems to have unnecessarily and voluntarily, out of curiosity or carelessly, or otherwise, exposed himself to this unguarded electric force, and therefore, even though respondents had been negligent, his administrator cannot recover. (*Fritz* v. *Salt Lake Elec. Co.,* 18 Utah, 493, 56 Pac. 90; *Carroll* v. *Grande Ronde Elec. Co.,* 47 Or. 424, 84 Pac. 389, 6 L. R. A., n. s., 290.) Where the servant needlessly goes into a dangerous place, and his injury is proximately due thereto, he cannot recover. (Shearman & Redfield on Negligence, sec. 207; *Atwood* v. *Chicago, R. I. & P. Ry. Co.,* 72 Fed. 447-450.)

A servant is chargeable with actual notice of every fact which he would have known had he exercised ordinary care to keep himself informed as to matters concerning which it was his duty to inquire; and especially should this rule be applied where the servant's action is founded on the assumption that the master ought to have known of something which he did not actually know. (Shearman & Redfield on Negligence, sec. 217; *St. Louis, K. C. & C. R. Co.* v. *Conway,* 156 Fed. 234, 86 C. C. A. 1; Woods on Master and Servant, sec. 402; Bailey on Master's Liability, 22; *Galvin* v. *Old Colony Co.,* 162 Mass. 533, 39 N. E. 186; *Kauffman* v. *Maier,* 94 Cal. 269, 29 Pac. 481, 18 L. R. A. 124; see, also, *Burn* v. *Chronister L. Co.* (Tex.), 87 S. W. 163; *Kresanowski* v. *Northern Pacific Ry. Co.,* 18 Fed. 229, 5 McCrary, 528; *Tower Lumber Co.* v. *Brandvold,* 41 Fed. 919, 73 C. C. A. 153; *Crookston Lbr. Co.* v. *Boutin,* 149 Fed. 680, 79 C. C. A. 368; *Morris* v. *Duluth Ry. Co.,* 108 Fed. 747, 47 C. C. A. 661; *Gilbert* v. *Burlington & M. Ry. Co.,* 128 Fed. 536, 63 C. C. A. 27; *Montgomery* v. *Chicago G. W. Ry. Co.,* 109 Mo. App. 88, 83 S. W. 66.) This is the rule where the servant is *pro tempore* his own master, and therefore under obligations to look after his own welfare and safety. A different rule applies when he

is acting under a specific command from his master or from the master's representative.   (*Witliam* v. *Tenino Stone Quarry,* 48 Wash. 127, 92 Pac. 900; *Anderson* v. *Inland Tel. Co.,* 19 Wash. 575, 53 Pac. 657, 41 L. R. A. 410.)   When the danger which besets the servant is apparent, it is equivalent to notice from the master of the existing dangers.   (*Ford* v. *Heffernan Eng. Wks.,* 48 Wash. 315, 93 Pac. 417, 418.)   When the facts are undisputed, and they permit only the one inference to be drawn from them that there was no occasion for the accident consistent with proper prudence and care on the part of the injured person, the plaintiff has failed to make a case.   (*Baxter* v. *Auburn & S. Elec. Co.,* 190 N. Y. 439, 83 N. E. 469.)   Where electrical appliances and machinery are so placed that persons would not, in the pursuance of their ordinary duties or vocations, or while acting within the scope of their licenses, come in contact therewith, the company is not liable to one occupying the position of a licensee or of a trespasser who is injured by such contact.   (15 Cyc. 475; *Clements* v. *Louisiana Electric Co.,* 44 La. Ann. 692, 32 Am. St. Rep. 348, 11 South. 51, 16 L. R. A. 43.)   Where "the evidence is undisputed, or is so clearly preponderant that it reasonably admits of but one conclusion, the proper disposition of the case upon the evidence becomes a question of law, to be determined by the court."   (*Bell* v. *Carter,* 164 Fed. 417; *Robinson* v. *Denver City Tramway Co.,* 164 Fed. 174; *Swift & Co.* v. *Johnson,* 138 Fed. 867, 71 C. C. A. 619, 1 L. R. A., n. s., 1161; *Patillo* v. *Allen-West Min. Co.,* 131 Fed. 680, 65 C. C. A. 508; *Commissioners etc.* v. *Clark,* 94 U. S. 278, 24 L. Ed. 59; *Southern Pac. Co.* v. *Pool,* 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485; *Patton* v. *Texas R. R. Co.,* 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361.)

MR. JUSTICE SMITH delivered the opinion of the court.

1. It is suggested by the respondents that the complaint shows that the relation of master and servant did not exist between the defendants and the deceased.   We find no express allega-

tion in the complaint that deceased was the servant of the defendants, but we do find the averments that deceased was "employed and hired by the defendant Madison River Power Company," and was "employed" by the company, and was "engaged in the performance of his duty under his employment"; and, as the gravamen of the whole complaint is that it was the duty of the defendants to use ordinary care to furnish the deceased a reasonably safe place in which to work, we think the complaint is sufficient in this particular.

2. But it is insisted that, if the complaint is sufficient in this regard, there was a fatal variance between the allegations thereof and the proof, in that the evidence shows that deceased was not a servant, but an independent contractor. The following pertinent quotation from 1 Shearman & Redfield on Negligence, sections 164, 165, we take from the brief of counsel for the respondents:

"Sec. 164. Although, in a general sense, every person who enters into a contract may be called a 'contractor,' yet that word, for want of a better one, has come to be used with special reference to a person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details. The true test of a 'contractor' would seem to be that he renders the service in the course of an independent occupation, representing the will of his employer only as to the *result* of his work, and not as to the means by which it is accomplished. * * *

"Sec. 165. * * * If he submits himself to the direction of his employer as to the details of the work, fulfilling his wishes, not merely as to the result, but also as to the means by which that result is to be attained, the contractor becomes a servant in respect to that work. * * * In most instances the distinction is easily observed. Thus one who contracts to do a specific piece of work, furnishing his own assistants, and executing the work either entirely according to his own ideas, or in accordance with a plan previously given to him by the person for

whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is clearly a contractor, and not a servant. The fact that such an employee is paid by the day, or that, in all the work, he consults and defers to the wishes of his employer, makes no difference, although an express contract to pay by the job is always strong evidence that the relation of master and servant does not exist.''

It appears from the testimony that Davidson told McCabe that he wanted him to go out to the substation for the purpose of doing some work, and directed him to get another man to help him. In employing Howerton, McCabe acted as agent of the defendants. McCabe understood they were to be paid by the hour. The officers of the company pointed out what work was required. The materials were furnished by the company. The general plans were those of the company. In fact, the testimony shows that McCabe and Howerton submitted themselves to the control of the company and its officers in all the details of the work, and did not in any sense use their own means or methods, except in so far as they contributed to the work that special knowledge and experience possessed by them as carpenters, not possessed by the officers of the company. They were servants and employees, and not independent contractors. (*Jensen* v. *Barbour*, 15 Mont. 582, 39 Pac. 906.)

3. Reading the testimony of McCabe and Davidson in the light of what was said in *Allen* v. *Bell*, 32 Mont. 69, 79 Pac. 582, we think that Davidson was not a fellow-servant with deceased.

4. It is contended that the complaint does not state facts sufficient to constitute a cause of action, ''in that it shows the proximate (or a proximate) cause of the injury to have been the act of Howerton, and it fails to show his freedom from negligence in the doing of the act.'' The cases of *Nord* v. *Boston & Montana Con. C. & S. Min. Co.*, 30 Mont. 48, 75 Pac. 681, *Ball* v. *Gussenhoven*, 29 Mont. 321, 74 Pac. 871, and *Cummings* v. *Helena & Livingston S. & R. Co.*, 26 Mont. 434, 68 Pac. 852, are relied upon. The quotation above is taken from the opinion of Mr. Commissioner Clayberg in the *Nord Case,* citing *Kennon* v.

*Gilmer,* 4 Mont. 433, 2 Pac. 21. But the pleader in this case has complied with the general rule laid down in *Kennon* v. *Gilmer*. He alleges that deceased ''was engaged in the performance of his duty''; that he ''accidentally lost his footing and in an attempt to prevent his falling from said height to the floor below, and, not knowing that the same was charged with electricity, threw his arm over the said wire''; that he ''was inexperienced with electric wires, and did not know that the wire * * * was charged with electricity, and did not know that the said place where he was working was dangerous and unsafe because of the danger of his coming in contact with wires charged with electricity''; that the defendants had knowledge and notice of said conditions and negligently failed to inform deceased of them. We think this statement of the facts is a sufficient compliance with the rule, and that a formal allegation that deceased was free from contributory negligence was not necessary.

5. Appellant's counsel contend that under the admissions in the pleadings and the undisputed proofs on the trial there was and is only one question in the case, namely, whether Howerton was warned of the danger, and we are inclined to agree that this is the principal question involved. No complaint is made that the substation was not properly constructed, or that any of the appliances were defective or insufficient. It is alleged in the complaint, and tacitly admitted in the answer, that the wires were dangerous, or at least that wires charged with a high degree of electricity are liable to cause injury or death. The real grievance complained of is the failure to warn the plaintiff of the danger, inasmuch as he was ignorant of it. The defendants contended, and sought to prove, that the deceased was warned sufficiently so that he not only knew of the danger, but fully appreciated it. The question of the failure of the defendants to furnish approved or different appliances is not in the case. As we read the complaint, it charges that the place was dangerous, but that Howerton did not know of the danger or appreciate it, and that the defendants did have such knowledge and appre-

ciation of the danger, and negligently failed to communicate such knowledge to the deceased. That the case was tried upon this theory is shown by the defendants' answer and the nature of their evidence. The complaint in its general allegations of negligence is not very definite, certain or specific, but it is sufficient in that regard to withstand the attack made upon it in this court. A servant does not assume the risk of extraordinary dangers of which he has no knowledge or appreciation. (*Hollingsworth* v. *Davis-Daly Copper Co., ante,* p. 143, 99 Pac. 142; *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45.) We also think the complaint satisfies the rule laid down in *Fearon* v. *Mullins,* 35 Mont. 232, 88 Pac. 794.

6. As the case must be retried, we do not deem it proper to comment upon the testimony to any greater extent than to say that the case does not fall within the principle considered in *McGowan* v. *Nelson,* 36 Mont. 67, 92 Pac. 40, *Howie* v. *California Brewery Co.,* 35 Mont. 264, 88 Pac. 1007, or *Olsen* v. *Montana Ore Pur. Co.,* 35 Mont. 400, 89 Pac. 731, but rather within the rules recognized in *Forquer* v. *Slater Brick Co.,* 37 Mont. 426, 97 Pac. 843, and *Hollingsworth* v. *Davis-Daly Copper Co., supra.* It is reasonably certain that Howerton's death was due to contact with the highly charged wire; and, if the jury believed McCabe's testimony, they might have concluded that deceased was engaged in doing what he was directed to do by the defendants, and had no knowledge that there was any danger to be apprehended from touching the wire.

7. We cannot say, as a matter of law, that the evidence discloses contributory negligence, or any negligence, on the part of the deceased. (*Birsch* v. *Citizens' Electric Co.,* 36 Mont. 574, 93 Pac. 940.)

8. On the point made by the respondents that deceased assumed the risk of danger from the wires, we have only to call attention, in addition to the fact that deceased was a carpenter and not an electrician, to McCabe's testimony as to what experience they had had with the outside wires, and what Davidson said with relation thereto.

9. It is not necessary to inquire to what extent a jury may disregard testimony. It cannot be said that Davidson's testimony was uncontradicted or unimpeached. We think the cause should have been submitted to the jury.

The judgment and order are reversed, and the case is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied March 13, 1909.