## GREENING, Appellant, v. GAZETTE PRINTING CO., Respondent.

(No. 7,852.)

(Submitted March 15, 1939.    Decided March 31, 1939.)

[88 Pac. (2d) 862.]

*Mr. Thomas C. Colton, Mr. H. L. Maury* and *Mr. A. G. Shone,* for Appellant, submitted a brief; *Mr. Colton* and *Mr. Shone* argued the cause orally.

160

*Messrs. Crippen & Crippen* and *Mr. H. L. Myers,* for Respondent, submitted a brief; *Mr. H. C. Crippen* and *Mr. Myers* argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This is an appeal from a judgment of nonsuit rendered by the district court of Yellowstone county in favor of the Gazette Printing Company, a corporation, and against Jake Greening.

The appellant Greening brought an action against the respondent company to recover damages for injuries sustained by him to his person by reason of the alleged negligent acts of one Don Stewart, who it is alleged was a servant and em-.

ployee of the respondent at the time appellant received his injuries, and acting within the scope of his employment for the respondent corporation. The negligent act of Stewart complained of consisted of his running a motorcycle into the appellant as the latter was standing near a fence at the edge of a public highway in Yellowstone county.

To prove that the relation of master and servant existed between respondent corporation and Stewart, the appellant offered in evidence a document known as an "employer's written acceptance," filed by respondent with the Industrial Accident Board of the state of Montana, and the "affidavit of posting" required by law. This document was marked "Plaintiff's Exhibit No. 5." At the same time appellant offered in evidence the pay roll of the respondent, which was filed also with the Industrial Accident Board, it being marked "Plaintiff's Exhibit No. 6." Upon objection the court refused to admit these two exhibits. On neither of these exhibits does the name of Don Stewart appear, nor do the names of any other persons appear on these exhibits, as they are only a listing of the various classes of employees of the respondent and the number in each class. An examination of the two proposed exhibits does not indicate that they would have any probative value, nor that they were connected up by oral testimony with the attempted proof that Stewart was a servant of the respondent, and no error is shown by the court's refusal to admit them.

As further proof that the relationship of master and servant existed between respondent and Don Stewart at the time of the negligent act complained of, the appellant introduced in evidence the contract entered into on August 30, 1936, between Don Stewart and the respondent corporation. This contract was Plaintiff's Exhibit No. 7.

The sole question for decision here is whether there was sufficient evidence introduced by appellant showing the relationship of master and servant between Stewart and the respondent corporation to warrant the court in denying the motion for nonsuit; if there was, the court was in error in granting the

motion. The determination of the question depends almost entirely on the interpretation of the contract mentioned above. The contract in full is as follows:

"The Billings Gazette

"Billings, Montana

"Contract.

"Age 19                              Date effective Aug. 30, 1936.

"This contract made and entered into this 28th day of August, 1936, by and between Don Stewart, Route 2 of Billings, Mont., party of the first part and hereinafter designated as Carrier, and The Billings Gazette, of Billings, Montana, party of the second part. For the handling of Billings Gazette Route No. Motor Route No. 2.

"The Carrier agrees to pay to party of the second part for all papers furnished him at 1¢ a copy for the Daily and 2¢ per copy for the Sunday. The Billings Gazette, party of the second part, reserves the right to at any time change the price charged the said Carrier. Bills to be paid in full each Saturday. If bill is not paid by this time The Billings Gazette reserves the right to cancel this contract and put another carrier on said route.

"The Carrier agrees to complete the delivery of his daily route not later than 5:45 p. m.; Sunday 7 a. m.. That he will not sell or offer for sale his route, that he will handle no publication other than the Billings Gazette during the life of this contract.

"The Carrier agrees to make no collection during regular time of delivery either week day or Sunday. That he will report all stops and changes of address of every subscriber on his route. That he will furnish, upon request the full name and correct addresses of every subscriber on his route, at such time as called on by The Billings Gazette.

"The Carrier agrees to perform faithfully the duty of carrier on route mentioned in the above paragraph and to be courteous and businesslike in all his dealings with his subscribers on said route. It is hereby further agreed that said party of the first part will solicit consistently on his route for

new subscribers to The Billings Gazette and on special occasions when deemed advisable by the Billings Gazette.

"The Carrier agrees and it is also understood that all money collected in the above mentioned district from subscribers to The Billings Gazette is and shall be considered property of the aforesaid newspaper until all papers furnished by The Billings Gazette have been paid for as per above paragraph.

"The Carrier agrees to keep at all times a complete and up-to-date route list of all carrier subscribers and non-subscribers and their addresses, which route lists shall be at all times subject to inspection by and held to be the property of the second party and the said list shall upon the termination or cancellation of this contract be delivered immediately to the second party. Failure to comply in full to this section and if said route lists are found by representatives of this firm in other than conditions specified, it is understood and agreed that such expenses as necessary to properly correct records will be paid by party of the first part.

"The Carrier further agrees to notify the Circulation Manager at least 30 days in writing before giving up said route. That he will teach the incoming carrier and that he will furnish the said incoming carrier a complete list of names and addresses of all subscribers on said route and when and where to collect same.

"The party of the second part reserves the right to cancel this contract if said first party fails in any respect to comply with all the terms and conditions herein contained to the satisfaction of said second party.

"In testimony whereof, We have hereunto set our hands, this day and year first above written.

"THE BILLINGS GAZETTE
"DON STEWART, Carrier
"Date August 28, 1936.

"Approved:

"E. C. AITCHISON
"Circulation Manager.

"I, the undersigned, guarantee and agree that the said Carrier Don Stewart will perform his part of said contract in every particular and will pay all bills for papers, and if said Carrier fails, neglects or refuses to pay said bills, any or all, of them that I, said undersigned, will pay all the same in cash to said Billings Gazette on demand.

"In consideration thereof I have deposited as a Cash Bond with The Billings Gazette ten dollars ($10.00), which Cash Bond is to be returned to me within two weeks after the completion of this contract by Don Stewart party of the first part, said bond to bear 2% (two per cent.) interest.

"JOHN STEWART<br>"Surety.

"Witness ——

"Dated at Billings, Mont., this 28th day of August, 1936."

The testimony shows that Stewart was engaged in delivering papers under this contract at the time the injury to the appellant occurred; that he had delivered several papers on the route prior to the time of the collision, and that he was on his regular route for the purpose of completing the day's deliveries.

As between the parties, the written contract is controlling as to the relationship, and ordinarily neither party may vary it by parol testimony; but as to third parties, this is not the case. Whatever obligations the relation might impose on either as respects third parties could not depend upon the nature of the stipulations, but must spring from the relation itself. Thus, if one is injured by the servant of another, it is immaterial to him what the terms of the agreement between employer and employee might be. The liability must come from the fact that the employer exercises control over the actions of the person in his employment. The injured third person can show the necessary degree of control to constitute a master-servant relationship existed even though the contract between the parties did not reveal that such control was contemplated. Appellant in this case, then, could show that even though the written contract did not provide for the control

necessary to constitute the master-servant relationship, actually such control was exercised to create the relationship.

There is some testimony here that by a separate oral agreement the respondent was to pay to the carrier fifty cents for each subscription secured by him. This does not have the effect of modifying or changing the relationship from that set out in the written agreement. There was no testimony to show that any control over Stewart, other than that provided for in the contract, was exercised by the respondent, and particularly there is no showing of any such exercise of control on the day of the injury complained of. Had such a showing been made, the question of the relationship at the time of the injury should properly have been submitted to the jury; but since no such showing was made, the relationship must be determined by the contract itself.

Whether Stewart was an independent contractor or a mere ██ ██ servant of the respondent must be determined from the contract above set out. Where the question of the relation depends upon the construction of an unambiguous written document, the question is one for the court. (*Batt* v. *San Diego Sun Pub. Co.*, 21 Cal. App. (2d) 429, 69 Pac. (2d) 216; *De Sandro* v. *Missoula Light & Water Co.*, 48 Mont. 226, 136 Pac. 711.) The matter then becomes one of law for the court to decide.

This court on a number of occasions has defined the term ██ "independent contractor," and has contrasted the relation of independent contractor and that of master and servant. One of the early reported cases in which the definition appears, is *Jensen* v. *Barbour*, 15 Mont. 582, 39 Pac. 906, 909. The facts in that case were that one Vaughan contracted to haul defendant's street car over its tracks in Great Falls once a day, Vaughan to furnish his own team and driver. In discussing Vaughan's status the court cited Shearman & Redfield on Negligence, sections 76 and 77, which appear in substantially the same form in a later edition of that work as sections 164 and 165, which sections are quoted in the *Poor Case,* later referred to herein. After quoting these sections from

Shearman & Redfield, the court said: "The respondent argues that Vaughan represented the will of his employer only as to the result of his work, and not as to the manner of its performance; that is to say, that Vaughan contracted to deliver to his employer the result of putting the car over the track once a day by his own methods. But so it might be argued that one's coachman contracts to produce the result of conveying his master from his house to his office, or whereever he may wish to go; or one's cook contracts to produce the result of placing before his master his daily food. But such is not the sense in which the word 'result' is used in the rule. We think that the word 'result,' as so used, means a production or product of some sort, and not a service. One may contract to produce a house, a ship or a locomotive and such house, or ship or locomotive produced is the 'result.' Such 'results' produced are often, and probably generally, by independent contractors." The court goes on to list plowing of a field, mowing a lawn etc., as not "results" within the rule, but merely services, and thus the person doing the work cannot be independent contractors but, instead, can never be anything but mere servants, no matter what the arrangements as to manner of payment, control, etc.

As pointed out in the language quoted from later Montana cases in this opinion, this distinction between independent contractor and servant, based upon the definition of "results," has not been adopted in later opinions by this court. As a matter of fact, in *Shope* v. *City of Billings*, 85 Mont. 302, 278 Pac. 826, hereinafter cited and quoted from, the court criticizes the language of the *Jensen Case* as not promulgating a correct criterion of the difference between an independent contractor and a servant. We may safely say that the *Jensen Case* has been very largely modified and overruled by subsequent decisions of this court. A painstaking search of the authorities fails to reveal that the criterion set up in the *Jensen Case* has ever been adopted by the courts of any other jurisdiction.

A later case, *Poor* v. *Madison River Power Co.*, 38 Mont. 341, 99 Pac. 947, 953, quotes sections 164 and 165 of 1 Shearman &

Redfield on Negligence, for a definition of the term as follows:

"Sec. 164. Although, in a general sense, every person who enters into a contract may be called a 'contractor,' that word, for want of a better one, has come to be used with special reference to a person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details. The true test of a 'contractor' would seem to be that he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."

"Sec. 165. * * * . If he submits himself to the direction of his employer as to the details of the work, fulfilling his wishes, not merely as to the result, but also as to the means by which the result is to be attained, the contractor becomes a servant in respect to that work. * * * In most instances the distinction is easily observed. Thus one who contracts to do a specific piece of work, furnishing his own assistants, and executing the work either entirely according to his own ideas, or in accordance with a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is clearly a contractor, and not a servant. The fact that such an employé is paid by the day, or that, in all the work, he consults and defers to the wishes of his employer, makes no difference, although an express contract to pay by the job is always strong evidence that the relation of master and servant does not exist."

The court, in *Allen* v. *Bear Creek Coal Co.*, 43 Mont. 269, 115 Pac. 673, 679, said: "The relation of the parties under a contract of employment is determined by an answer to the question, Does the employé in doing the work submit himself to the direction of the employer, both as to the details of it and the means by which it is to be accomplished? If he does, he is a servant, and not an independent contractor. If, on the other hand, the employé has contracted to do a piece of

work, furnishing his own means and executing it according to his own ideas, in pursuance of a plan previously given him by the employer, without being subject to the orders of the latter as to detail, he is an independent contractor.''

In *Shope* v. *City of Billings,* supra, as has been indicated, this court criticized the language of *Jensen* v. *Barbour,* supra, saying: ''The use of the word 'result' in these definitions, and the reasoning employed by Mr. Justice De Witt in *Jensen* v. *Barbour* with respect to its use in this connection, are criticized in the note appended to *Westover* v. *Hoover,* 19 A. L. R. 215, see page 234. Its use was avoided in *Allen* v. *Bear Creek Coal Co.,* 43 Mont. 269, 115 Pac. 673.'' In the *Shope Case,* supra, it was said that a good general definition of an independent contractor, and one that harmonized with the *Allen Case,* supra, is the rule promulgated by the author of the note to the *Westover Case,* in 19 A. L. R., supra: ''An independent contractor is a person employed to perform work on terms that he is to be free from the control of the employer as respects the manner in which the details of the work are to be executed.'' The court, in discussing the matter of control, said: ''As to control, it is necessarily implied that the employer may insist that the contract shall be performed according to its specifications.''

In the most recent case discussing the question exhaustively, *Harrington* v. *H. D. Lee Mercantile Co.,* 97 Mont. 40, 33 Pac. (2d) 553, 558, the court had an opportunity to repeat and amplify its definitions of the term ''independent contractor.'' In that case one Thompson was a salesman for the H. D. Lee Mercantile Company. He traveled in his own car, arranged his own schedule, sold the goods at the price fixed by the company, and paid his own expenses. Under his arrangement with the company he was expected to cover a certain territory, and to sell a certain amount of merchandise in each year. Occasionally the company requested him to go to certain places, and he followed its requests at his convenience. After discussing the facts, it was said: ''Clearly, the relation of master and servant did not exist between the company and Thompson.

Those rendering service but retaining control over the manner of doing it are not servants. An agent who is not subject to control as to the manner in which he performs the acts which constitute the execution of his agency is in effect an independent contractor. ([Restatement of the Law of Agency], sec. 220.) 'A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. In their movements and their control of physical forces they are in the relation of independent contractors to the principal. It is only when to the relation of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relation of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor.' (Restatement of the Law of Agency, sec. 250.)''

Although in the *Harrington Case,* supra, the court was distinguishing between a mere agent and an independent contractor, yet the language quoted is applicable to the present case, and presents a clear definition of an independent contractor and, with exception of a brief reference in *Coombes* v. *Letcher,* 104 Mont. 371, 66 Pac. (2d) 769, is the latest case in which an independent contractor is defined.

From the definitions in the Montana cases cited, which, with the exception of the definition in the *Jensen Case,* supra, are in harmony with the holdings in practically every jurisdiction, it is possible, upon an examination of the contract here, to determine the status of Stewart with relation to the respondent.

Counsel for the appellant have cited a number of cases laying down elaborate rules for determining whether or not a particular party is an independent contractor or a mere servant. The determination of the question is often difficult, and it is sometimes necessary to have recourse to a number of rules laid down by the courts to determine whether the actor is an independent contractor. Recourse to the various refinements

of the rule is necessary in those cases where it is impossible to determine from the contract and from the action of the party, the degree of control exercised or the degree of control which the employer might exercise over the person performing the work. It is not necessary here to consider all of these various refinements. An examination of the contract shows that, in the most important particular, namely control by the respondent, Stewart was not in the position of a mere servant. He contracted to produce certain results. The contract itself was the plan previously given him by the employer contemplated in the *Allen Case,* supra. His job was to deliver the papers, and that is what he contracted to do. He was not subject to the control of the company as to the method or means by which he was to secure the delivery. He was to furnish his own means of transportation. He could travel by automobile, horseback, motorcycle or by any way he chose, so long as he got the papers delivered to all of the customers and within the time set by the contract.

It is true that the contract provided that he was to be courteous and businesslike in delivering the papers to the subscribers, and it is also true that the contract contemplated that he was to solicit consistently for subscriptions. It is apparent from the contract that it was contemplated that Stewart was personally to perform the services called for. If there was any question as to who was to control Stewart's methods and means in performing his duties, a discussion of all of these things would be necessary to determine the result in this case. In the single essential to a determination of Stewart's status, namely, the degree of control that could be exercised by the respondent over him as to his methods and means of performance under the contract, there can be no doubt.

Stewart was not under the control of the respondent as to the details of his manner of performing under the contract. He was free to choose any means he wanted to of covering the route. He could travel it in any direction he chose and by any road that would take him to all of the subscribers. He could employ assistants or do the work alone. The testimony

shows 'that at the time of the collision he was accompanied by another boy who, it is logical to assume, went with him at his request to assist him. He was required to be courteous and businesslike, but that amounts to the same thing as requiring a builder to do a good job of building a house, and no more than was required, we assume, in the *Harrington Case*, supra, of Thompson, the salesman. The fact that Stewart was required, under the contract, to solicit consistently for new subscribers, and especially when the respondent deemed it advisable, does not indicate that because of that fact any increased control was contemplated. Even when soliciting, the contract is silent as to how he was to go about it, and it is apparent that he was to have control of the methods and means by which he performed this part of the contract. The respondent wanted the result of new subscriptions, and Stewart contracted to produce them by his own methods. In performing all of his duties under the contract, Stewart retained control over the manner of performance. "Those rendering service but retaining control over the manner of doing it are not servants." (Restatement of the Law of Agency, p. 485.)

A great number of cases have been cited to the court by both the appellant and respondent. We have examined the cases so cited, and many of them are applicable to some elements of this case; practically all of them, on somewhat similar facts, hold the carrier to be an independent contractor. Since our own court has adequately defined the controlling test in determining whether or not the particular person is an independent contractor with relation to another, or a servant, we do not feel it necessary to discuss all of the citations made. Most of them have to do with cases in which the principal is a newspaper publisher and the employee is engaged in delivering papers for the company, but nearly all of these cases can be distinguished from the present one on the facts, including most of the cases cited by the respondent. The leading case cited by the appellant, *Wilson* v. *Times Printing Co.*, 158 Wash. 95, 290 Pac. 691, is distinguishable on the facts from the present case in several respects. The chief distinction rests on the

degree of control exercised by the company over the carrier in the performance of his work. The publisher in that case retained a high degree of control over the carrier and gave him detailed instructions frequently as to where he was to go and what he was to do. It was impossible to say in that case that there was any previous plan agreed upon such as contemplated by the language of the *Allen Case*, supra. In addition to that, the carrier was paid at least partly on a monthly basis.

For a general discussion of the distinction between an independent contractor and a servant, see 2 C. J. S., Agency, sec. 2, p. 1027; 19 A. L. R. 226; 20 A. L. R. 684; 1 Thompson on Negligence, 570; 65 L. R. A. 445; 14 R. C. L. 65; 18 R. C. L. 781; Restatement of the Law of Agency, page 485. See, also, the following cases: *Post Pub. Co.* v. *Schickling,* 22 Ohio App. 318, 154 N. E. 751, *Mason & Hodge Co.* v. *Highland, Ky.,* 116 S. W. 320, *Skidmore* v. *Haggard,* 341 Mo. 837, 110 S. W. (2d) 726, *Gall* v. *Detroit Journal Co.,* 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164, *Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, 159 Pac. 721, *Oklahoma Pub. Co.* v. *Greenlee,* 150 Okl. 69, 300 Pac. 684, *State Compensation Insur. Fund* v. *Industrial Acc. Com.,* 216 Cal. 351, 14 Pac. (2d) 306, *Joslin* v. *Idaho Times Pub. Co.,* 56 Idaho, 242, 53 Pac. (2d) 323, *Bohanon* v. *James McClatchy Pub. Co.,* 16 Cal. App. (2d) 188, 60 Pac. (2d) 510, *Rathbun* v. *Payne,* 21 Cal. App. (2d) 49, 68 Pac. (2d) 291, *Batt* v. *San Diego Sun Pub. Co.,* supra, *Singer Mfg. Co.* v. *Rahn,* 132 U. S. 518, 10 Sup. Ct. 175, 33 L. Ed. 440, and *Hurla* v. *Capper Publications, Inc., Kan.,* 87 Pac. (2d) 552.

No error was committed by the court below in granting the motion for nonsuit. The judgment is affirmed.

Mr. Chief Justice Johnson and Associate Justices Morris, Angstman and Stewart concur.