## CUMMINGS, APPELLANT, v. HELENA & LIVINGSTON SMELTING & REDUCTION CO., RESPONDENT.

### (No. 1,383.)

(Submitted November 20, 1901.  Decided April 29, 1902.)

*Master and Servant—Mining—Action for Injury—Motion for Nonsuit—Rule of Consideration—Contributory Negligence —Pleading—Burden of Proof—Evidence — Contributory Negligence—Ordinary Care.*

1. On motion for a nonsuit, the evidence will be regarded in the light most favorable to plaintiff, and that which it tends to prove must be taken as proved.

2. Where plaintiff's own evidence shows that he ought not to recover, a nonsuit should be granted.

3. Though, in actions for injuries, the absence of contributory negligence need not be pleaded, if the complaint shows that plaintiff's own act was a proximate cause of the injury it must also state his freedom from negligence in doing such act.

4. Where plaintiff's evidence in an action for injuries shows that the injuries were caused in whole or in part by his own acts, the burden is cast upon him to prove that he was exercising ordinary care at the time.

5. Where, in an action for injuries, plaintiff's evidence shows, beyond question, that his own omission to use ordinary care contributed immediately to, or itself caused, the injury, a nonsuit should be granted.

6. Evidence reviewed, and *held*, that plaintiff, in proving the circumstances of the accident and injury, succeeded in establishing for the defendant the defense of contributory negligence, and hence, the granting of a nonsuit was proper.

*Appeal from District Court, Jefferson County; M. H. Parker, Judge.*

Action by Martin Cummings against the Helena & Livingston Smelting & Reduction Company. From a judgment in favor of defendant, plaintiff appeals. Affirmed.

*Mr. T. J. Walsh,* and *Mr. C. B. Nolan,* for Appellant.

On the review of a motion for nonsuit, everything which the evidence tended to prove will be assumed to be true by the appellate tribunal. (*Creek* v. *McManus,* 13 Mont. 157; *Wetzstein* v. *Joy,* ib. 444; *Mayer* v. *Carothers,* 14 ib. 288; *State ex rel. Pigott* v. *Benton,* 13 Mont. 322; *Powers* v. *Klenzie,* 15 Mont. 179; *Jensen* v. *Barbour,* 15 Mont. 586; *Soyer* v. *Great Falls Water Co.,* 15 Mont. 5; *Emerson* v. *Eldorado Ditch Co.,* 18 Mont. 254; *Holter Lumber Co.* v. *Fireman's Ins. Co.,* 18 Mont. 288; *State ex rel. Harmon* v. *Conrow,* 19 Mont. 106; *Morse* v. *Com. of Granite Co.,* 19 Mont. 453; *Cameron* v. *Commercial Co.,* 22 Mont. 312.)

Negligence is generally an inference from many facts and circumstances, all of which it is the province of the jury to find. It is not the duty of the court in such cases, any more than in any other, to usurp the province of the jury, and pass

upon the facts; and a nonsuit can only be granted in such cases where the evidence of the misconduct of the party injured is so clear and irresistable as to put the case on a par with those cases where a nonsuit is granted for a failure to introduce evidence sufficient to go to the jury upon some point essential to plaintiff's case. (*Wall* v. *Helena St. Railway Co.*, 12 Mont. 49.) The primary duty devolved upon the defendant to employ competent men. This duty it owed to the plaintiff. Equally imperative was it if the incompetency of the servant came to its knowledge after his employment to discontinue the service of such employe. (*Kelley* v. *Cable Co.*, 7 Mont. 80; *Kelley* v. *Fourth of July Co.*, 16 Mont. 497; *Webster Manufacturing Co.* v. *Schmidt*, 77 Ill. App. 49; *Dysart* v. *Kansas City, etc.*, 145 Mo. 83; *Maitland* v. *Gilbert Paper Co.*, 97 Wis. 476.)

While this duty devolves upon the master to furnish competent servants, if the fact of incompetency is known to the fellow servant and he continues in the employ of the master, there is on his part an assumption of the risk. (*Stafford* v. *Chicago, etc. R. Co.*, 114 Ill. 244.) If, however, the master promises that the danger due to the neglect of the fellow servant will be remedied, a retention of employment for a reasonable time will be warranted, without the assumption of risk therefrom, or without contributory negligence, unless the danger is so apparent, imminent and immediate that a man of ordinary prudence would refuse so to remain. (*Smith* v. *Backus Lumber Co.*, 64 Minn. 447; *Kelley* v. *Fourth of July supra; Daugherty* v. *Midland Steel Co.*, 53 N. E. Rep. 844; *McFarland Carriage Co.* v. *Potter*, 153 Ind. 107; *Nelson* v. *Shaw*, 102 Wis. 274.) If the master promises the employe that an incompetent servant will be removed, he is justified in remaining a reasonable time. (*Lyberg* v. *N. P. Railroad Co.*, 38 N. W. Rep. 632.) The instances are exceedingly rare where a servant can be held guilty of contributory negligence as a matter of law, where a promise has been given. The question is invariably one for the jury. (*Union Manufacturing Co.* v. *Morrissey*, 40 Oh. St. 148; *Northern P. Co.* v. *Babcock*,

154 U. S. 190; see cases cited, 40 L. R. A. 787, Note.)
Whether there was an actual promise is a question for the jury
where it arises from implication. (82 Iowa, 179.) It is always
a question for the jury as to whether the servant's reliance on
a promise by the master induced him to continue work. (*Man-
ufacturing Co. v. Morrissey,* 40 Ohio St. 148; *Rothenberger* v.
*N. W. Consolidated Milling Co.,* 57 Minn. 461.)

Where a master is negligent in furnishing defective ma-
chinery, one who continues in service under promise by another
servant to repair is injured, it is immaterial whether the ser-
vant making the promise had authority to do so, provided the
injured servant upon reasonable grounds supposed him to have.
(*Dells Lumber Co.* v. *Erickson,* 80 Fed. 257.) If the servant
has reasonable grounds for believing that the master will re-
move the source of danger, whether the impression is the result
of an explicit promise or not, he may continue working without
culpability as long as the jury may consider it reasonable to
retain that belief. (*Hoffman* v. *Dickinson,* 31 W. Va. 142.)
It is not necessary that there should be a formal protest or an
express promise. (*Rothenberg* v. *N. W. Con. Milling Co.,*
*supra; Pieart* v. *Chicago R. I. & P. Ry. Co.,* 82 Ia. 148.)

Much emphasis is given to the fact that no complaint was
made by the plaintiff. It is purely a question as to which as-
sumes the risk, the plaintiff or the defendant. (*Schlitz* v.
*Pabst,* 59 N. W. 188; *Green* v. *Railroad,* 17 N. W. 378;
*Smith* v. *Lumber Co.,* 67 N. W. 308.)

A foreman of a mine having authority to employ and dis-
charge a laborer employed therein, is not a fellow servant with
such laborer so as to relieve the owner from liability. (*Kelley*
v. *Cable Co.,* 7 Mont. 80.) Whether a foreman of a mine is
a fellow servant is a question of fact for the jury. (*Wellsville
Coal Co. v. Schwart,* 177 Ill. 272; *Hill* v. *Winston,* 75 N. W.
1030.) That parties are under his supervision and subject to
his control is the best evidence that he is a vice principal.
(*Union Pacific Railway Co.* v. *Doyle,* 70 N. W. Rep. 43.)
One who has power to employ and discharge laborers in his

department is a vice principal. (*Fort Smith Oil Co.* v. *Slover,* 58 Ark. 168.) It was the duty of the master to employ competent servants; if instead of performing this obligation, he engages another to do it for him, he is answerable for the neglect of that other, no matter what his position as to other matters. (*N. P. R. Co.* v. *Palerson,* 162 U. S. 346; *Hess* v. *Rosenthal,* 160 Ill. 621.) This doctrine is very clearly and forcibly announced in an elaborate note, 75 Am. State Reports, p. 595.

The duties of the master above enumerated are those imposed upon him by law. They are positive, absolute and personal, and the master, whether an individual or a corporation, cannot evade liability by delegating their performance to another. No duty belonging to the master to perform for the safety and protection of his servants can be delegated to any servant of any grade so as to exonerate the master from liability to a servant who has been injured by its non-performance. The agent to whom such duty has been delegated, whoever he may be, and notwithstanding he may be a fellow servant in other respects, is a vice principal or representative of the master. In other words, he is the master's *alter ego,* whose negligence is that of the master, and for which the master is responsible, whether an employe or a third person is injured thereby.

Contributory negligence is a matter of defense, and plaintiff need not allege or prove its absence. (*Higley* v. *Gilmer,* 3 Mont. 96; *Nelson* v. *City of Helena,* 16 Mont. 22; *Mulville* v. *Pac. Mut. L. I. Co.,* 19 Mont. 650.) If the question of negligence or contributory negligence is a fairly disputed question of fact, it must be resolved by the jury. (*Wall* v. *Helena St. Railway Co.,* 12 Mont. 50.) Contributory negligence being an affirmative defense cannot be considered on a motion for a nonsuit at the close of plaintiff's main case. (*Powell* v. *Southern Railway Co.,* 125 N. C. 370.) The present case differs in principle from one where the proximate cause of the injury was plaintiff's own act, in that event it would be in-

cumbent upon him to show that he was free from contributory negligence. (*Prosser* v. *Railway Co.,* 17 Mont. 388.)

It was error to deny plaintiff's application for leave to introduce supplementary proof. While conceding that a large measure of discretion vests in the trial court in a matter of this kind, we feel that here there was an absence of any reason why the application should be denied. (See *Pitts* v. *Florida Central R. R. Co.,* 27 S. E. Rep. 79, 189.)

*Messrs: Cullen, Day & Cullen,* and *Messrs. Toole & Bach,* for Respondent.

There is no dispute or disagreement between counsel as to the rule applicable to the review of the evidence on motion for nonsuit. Everything which the evidence tends to prove will be assumed to be true. But it is what the *evidence* tends to prove that is assumed to be true. Where the facts are undisputed and but one inference can be drawn from them, the plaintiff's right to recover thereunder is a question of law. And where the plaintiff fails to establish any fact from which the defendant's negligence could be inferred, the plaintiff is not entitled to recover and the motion should be granted. So, too, where the plaintiff's own evidence establishes his contributory negligence it bars his recovery as effectually as a failure to introduce any evidence upon a point essential to his case, and a motion for nonsuit should be granted. (*Wall* v. *Helena St. Ry. Co.,* 12 Mont. 49; 7 Amer. & Eng. Enc. Law (2d Ed.), 454.)

It is well settled that to make the master responsible for the negligence of the incompetent servant, it must not only appear that the servant was incompetent, but it must also appear that the injury resulted from such incompetency. (12 Amer. & Eng. Enc. Law, 918, and cases cited.) The facts in this case are very similar to those recited in *McAndrews* v. *Railway Co.,* 15 Mont. 299. In order to relieve the servant from the assumption of risk, the master should have induced the servant to waive his right to leave the service, either by taking upon

himself the responsibility for injuries which might result, or by leading the servant to believe that the danger would be removed. Where the declarations of the master are made for his own benefit, or for the purpose of advancing his own interest, they will not amount in law to such a promise as will relieve the servant from the assumption of risk. (*International & G. N. Ry. Co.* v. *Turner* (Tex.), 23 S. W. Rep. 146; see also *Lewis* v. *New York & N. E. Ry. Co.*, 26 N. E. 430.)

Portions of a mine from which ore is being taken, and which as the work progresses it becomes necessary to timber, are not, from the time it becomes necessary to timber them, places for work, within the rule requiring a master to furnish his employes a safe place to work. (*Petaja* v. *Min. Co.*, 66 N. W. 951.) It is not necessary that a servant should be warned of every possible manner in which injury may occur to him, nor of risks that are as obvious to him as to the master, and where a mature and experienced man engages in a dangerous occupation, with the risks of which he is familiar, and is injured, not through defect in the appliances, but by the manner of their operation, incident to the business, he cannot recover against the master. (*Logging Co.* v. *Schneider,* 74 Fed. 195.) "An important consideration, often overlooked, is whether the structure, appliance or instrumentality is one which has been furnished for the work in which the servants are engaged, or whether the furnishing and preparation of it is itself part of the work which they are employed to perform." (*Petaja* v. *Min. Co.* (Mich.), 66 N. W. 951; *Smith* v. *Gramp Co.*, 35 N. Y. S. 534; *Durst* v. *Carnegie Steel Co.* (Pa.), 33 Atl. 1102; *McCarthy* v. *Iron Works* (La.), 20 So. 171; *Kelley* v. *Cable Co.,* 7 Mont. 70; *Petaja* v. *Iron Min. Co.*, 64 N. W. 335; *Linton Coal & Mining Co.* v. *Persons,* 43 N. E. 651; *Spellman* v. *Ry. Co.,* 34 S. W. 298; *Kelley* v. *Fourth of July Mining Co.*, 16 Mont. 496.)

MR. JUSTICE PIGOTT delivered the opinion of the court.

The plaintiff, having suffered personal injuries in a mine

situate in Jefferson county and operated by the defendant, brought this action to recover $35,000 as damages. The injuries are alleged to have occurred through the defendant's negligence. When the plaintiff rested, the court granted a nonsuit upon several grounds, one being that the plaintiff had assumed the risk of the accident which occasioned the injury, and another being that he had been guilty of contributory negligence. Judgment for the defendant was then entered, and the plaintiff has appealed.

On motion for nonsuit, whatever the evidence is sufficient to prove in favor of the plaintiff must be considered as established; in other words, when such motion is interposed, the truth of the evidence tending to support the plaintiff's case must be assumed and must be regarded in the light most favorable to him,—that which the evidence tends to show must be taken as proved. This well settled rule has been repeatedly declared and applied by this court. No less well settled is the rule that if the plaintiff, in attempting to make a case, shows that he ought not to recover, either a nonsuit should be entered or a verdict directed on motion, whichever practice prevails in the particular jurisdiction. In this state, nonsuit is the technically correct method. (*McKay* v. *Montana Union Ry. Co.,* 13 Mont. 15, 21 Pac. 999.) In actions for personal injuries the absence of contributory negligence is not required to be pleaded or proved by the plaintiff, but its presence is a matter of defense. Such is the law in Montana. (*Higley* v. *Gilmer,* 3 Mont. 90, 35 Am. Rep. 450; *Mulville* v. *Pac. Mutual Life Ins. Co.,* 19 Mont. 95, 47 Pac. 650; *Snook* v. *City of Anaconda,* 26 Mont. 128, 66 Pac. Rep. 756.) The contrary rule was announced in *Ryan* v. *Gilmer,* 2 Montana Reports, 517, 25 American Reports, 744, but has been overturned by the cases cited and those referred to by the opinions therein. If, however, the complaint shows the proximate (or a proximate) cause of the injury to have been the act of the plaintiff, the complaint must also state his freedom from negligence in the doing of the act; otherwise the pleading is bad. (*Kennon*

v. *Gilmer*, 4 Mont. 433, 2 Pac. 21) ; and so, if the evidence in behalf of the plaintiff shows the injury to have been directly caused (either in whole or in part) by his act, the burden is immediately upon him to prove that he was exercising ordinary care at the time.   (*Nelson* v. *City of Helena*, 16 Mont. 21, 39 Pac. 905.)   Another rule, from which there seems to be no dissent except in North Carolina (*Bolden* v. *Railway Co.*, 123 N. C. 614, 31 S. E. 851; *Cogdell* v. *Railroad Co.*, 124 N. C. 302, 32 S. E. 706; *Powell* v. *Railway Co.*, 125 N. C. 370, 34 S. E. 530), is that if the evidence in plaintiff's behalf establishes, beyond question, that his own omission to use ordinary care contributed immediately to, or itself caused, the injury, the court should on motion direct a verdict or grant a nonsuit.

The motion for a nonsuit in the case at bar was similar to the common law demurrer to the evidence, in that it performed the office of admitting as facts what the evidence tended to prove, thereby presenting the question whether the facts so conceded, when viewed in the light most favorable to the plaintiff, were, as matter of law, sufficient to justify a verdict for him. So considering the evidence, the facts may be stated thus:   On Saturday, September 28, 1895, the plaintiff, aged 33 years, a practical miner of sixteen years' experience, familiar with the risk and dangers incident to the hazardous occupation, was severely injured by a fall of rock in the Alta mine, operated by the defendant, a corporation.   He had been so in the employ of the defendant and working for it as an underground miner in the Alta mine since 1892.   For many years he had operated a machine drill used for boring holes in tunnels and raises so that blasting might be done.   When hurt he was engaged in constructing a three-compartment inclined raise on the vein, following the foot wall, from the 1200-foot level to an intermediate tunnel eighty feet distant.   The raise departed from the perpendicular at an angle of about 45 degrees—the dip of the vein.   Each compartment was a separate chute; the middle one was the man-way, the others, one on each side of

the man-way, were used for ore. Four sets of timbers were
needed to make the three compartments. These consisted of
four equi-distant stringers, or uprights, next to the hanging
wall; four stulls or cross-pieces eight to ten feet in length (ac-
cording to the pitch of the walls) attached to, and supporting
the top of, the stringers, and reaching from wall to wall; three
"girds," or girders, laid on top of the stringers and parallel
with the strike or course of the vein, and running from stull
to stull. The stulls supported the stringers, and the girders
served to keep both in place. Each three-compartment section
of the rise was about six and one-half feet in height by thir-
teen in length, each room or compartment being about four feet
and four inches in length along the lode on its strike or course,
which is east and west. When the ground did not blast so as
to permit the stulls and stringers to fit snugly against the coun-
try rock, the stringers were lagged crosswise with round poles
four feet and four inches in length, and then the space between
the lagging and the hanging wall was filled in with waste so
as to keep the timbers secure. To make a floor, lagging of the
same sort was laid on top of the timbers from stull to stull, and
across the openings leading up to the face of the raise. The
machine was set upon the floor and the holes drilled overhead
in the face. Each set of four timbers carried the raise six and
one-half feet further towards the tunnel. A floor was not left
on each set of timbers, but whenever advance of a set higher
(six and one-half feet) had been made, the lagging of the lower
floor of the last set would be moved up and the top flooring of
that set left, so that there were always two floors lagged in
whole or in part. The top or upper floor was always left open
—that is, without lagging—on the side not blasted, in order
that the miners might gain ingress to it from the floor below
and see the face of the ground. After drilling and before
blasting, the space between the timbers immediately under the
ground to be blasted was always lagged. This was done as a
measure of protection to miners going to the lower floor; with
the upper floor (or top of the timbers) tightly lagged under

the ground blasted or about to be blasted, a man could, with a reasonable degree of safety, reach the lower floor, cross to the side or end over which blasting had not been done, or was not about to be done, and then go to the upper floor through the opening left under the solid ground. The plaintiff testified: "As we went up we would set the machine for the purpose of drilling on one of these floors, the bar set on one of those floors that would be lagged up. We put lagging on top of the timber, too, and that made a floor, and from that floor we bored above us. As we proceeded with the work, we did not leave these floors on each set of timbers; when we would get up a set higher we would pull up the under floor and move it on up again; we kept two floors all the time. We would pull the one below up; when we put a set of timbers above, we would pull the lower floor up and move up. We ascended the upraise to get where we were working through a ladder constructed in this manner. As the work was carried up we always left the top floor open on the side that was not blasted out, so that a man could get through there and see the face of the ground that was left and also see the ground where it was blasted." If, for example, the ground in the eastern part of the face of the raise was about to be, or had been blasted, the opening would be left on the western side or end under the secure ground. "In the place where it had not been blasted, it [the floor] would be left open, so that when I came up in the morning, by looking up I could see the face of the ground where the blasting had been done. We put lagging on the floor immediately under the place where we were going to blast, because that is where the man would come up on the first floor; if that floor was left open and a man would go up there, there would be nothing to protect him over his head, but with that floor lagged up a man would go up and cross over to the side that was not blasted, and then he would go up there."

For thirteen days before, and on the day of, the accident, the plaintiff was working on the day shift. One Running, his fellow servant, was working on the night shift, and had been

operating the drilling machine for a month. Running would quit work at ten minutes after five o'clock in the morning, and plaintiff would begin at ten minutes before seven—about one and one-half hours thereafter. Running had had but little experience with the machine. He sometimes bored holes which inclined away from, instead of toward, the center of the raise, and which, when fired, failed to blast down the ground; the effect of this was to shake the ground and make it unsafe. In order to drill the holes properly, so that the ground when blasted would come down easily, it was necessary to set the machine on one side of the raise and bore the holes toward the center over the man-way, and then remove the machine to the opposite side and bore the other holes toward the center. Holes drilled in this way "would have a cut so they could break their burden." The effect of drilling the holes was to shake or loosen the ground more or less, according to its character. Ground shaken or loosened by ineffective blasts, or by boring without blasting, should be lagged or spragged to prevent its falling upon those afterwards working under it. About a week before the accident the day shift-boss, noticing that Running had omitted to fire four out of six holes made by him, remarked to the foreman, who was authorized to hire and discharge the men, that such work would never do and "a man must be crazy to drill holes like that;" to which the foreman answered that it was the worst work he had ever seen, and asked the plaintiff for an expression of his opinion. The plaintiff told the foreman it was hard to keep the ground safe when holes were drilled in that way, for a bowlder might drop out at any time. The foreman then said he would look after Running's work carefully and inspect it, and told the plaintiff to keep at work and do the best he could, and perhaps Running's work would improve after a while. On Thursday, two days before the accident, Running drilled and fired six holes, which did not break, and the foreman told the plaintiff that Running was doing worse instead of better and that he would put a man in his place who understood that sort of work. Plaintiff, though

he did not announce his intention to do so, would have quitted the employ of the defendant on that day but for the alleged promise to discharge Running.

On Friday, the day before the accident, the plaintiff put in four sets of timbers, and lagged the stringers for about two and one-half feet above the floor. When he stopped work on that afternoon, the face of the ground over the west compartment, or chute, was about five feet above the top of the timbers and, hence, about eleven and one-half feet above the floor; over the east compartment or chute, the ground hung lower, being three feet above the top of the timbers, and hence about nine and one-half feet above the floor, projected three or four feet over the chute, and reached from the hanging to the foot wall. This ledge he sounded with a hammer before going off shift on Friday afternoon; finding it solid, he did not brace it. The space across the top of the sets of timbers was left open. Before going away on Friday afternoon, that plaintiff at 5:30 o'clock, fired and blasted four holes which had been drilled by Running the night before, in the center of the raise over the man-way; two were in the hanging- and two in the foot-wall; each was seven or eight feet deep and was started about one foot above the ledge projecting over the east chute. The further ends of the holes were about eight feet from the ledge. Each hole was one and one-half inches in diameter and contained powder to a depth of from eighteen inches to two feet. He did not go back to see what effect the blast had, or where the dirt and rocks fell; it was not his duty to do so. After he had blasted, the first man in the ordinary course of business to go into the raise made by the plaintiff, was Running, whose duties were to lag up the stringers, fill with waste the space between the stringers and the hanging-wall, drill two rounds of holes, lag the top of the timbers for a floor under the ground to be blasted, leaving the top open elsewhere, and to charge, fire and blast at ten minutes after five o'clock in the morning of Saturday. It was not his duty to observe the effect of the

blast. The next man to go into the raise after Running left, was the plaintiff.

At ten minutes before seven o'clock on the morning of Saturday, the 28th, the plaintiff, according to custom and in the performance of his duty as a servant of the defendant, went into the raise to continue the work. He had not inquired whether Running was still in defendant's employ, and did not know whether or not Running had worked there during the night. His first duty was to examine the ground for the purpose of ascertaining its condition and to remove that which was found to be broken down or loose. Reaching the first, or lower, floor at the west end of the section of the raise constructed by him on Friday, he saw that the timbers put in by him had been lagged entirely across the top sets, thereby making a floor which hid the face of the raise. The usual way of access was barred by this floor. Between the stringers (which he had partly lagged on Friday) and the hanging-wall there was a space three feet wide for waste. To reach the top floor he climbed up through this space and then over the girders. Thus he brought himself upon the top floor and next to the face of the raise. If the ground over the east chute had not been drilled or blasted, the floor should have been there left open; if drilled or blasted, it should have been closed by lagging. It was so closed; "it was lagged clear across the four sets, it was lagged right up tight." When he reached the top floor he saw that blasting had been done. He saw a large opening in the ground at the west end of the face of the raise. He knew that, thirteen hours before, he himself had blasted four holes over the center of the raise; this, he says, had no effect upon the projecting ledge on the east chute. He knew also that the man who had just gone off shift had drilled, and probably blasted, two rounds of holes. He found that the charges fired by him had knocked down part of the ground, and that the work had been continued from where the plaintiff had blasted almost to the intermediate tunnel,—a distance of two sets or thirteen feet from the top floor. "Running had lagged up that floor, and most of the ground that

he blasted was on top of this floor; he had the floor lagged right up tight to the girds, and the dirt was on top of the lagging, that is, the ore." He did not observe any holes that were not blasted. The first thing he did after getting on top of the floor was to pick down the loose ground blasted by Running, and break into the tunnel, which required half an hour's work. He then "sounded all around the walls of this space of ground that was blasted out that night," and fond it safe. To the face of the projecting ledge of rock, or bench of ground, he gave a "side glance," and the ledge seemed to him to be in exactly the same condition it was on the preceding afternoon when he left after blasting four holes, except that under it there was dirt on the lagging. He could not without stooping, or removing some lagging, see its "lower face," which (as has been stated) was about three feet above the lagging, overhanging the east chute three or four feet, and reaching clear across the vein from wall to wall. He could have examined the ground; there was nothing to prevent him from doing so. Though he made examination of the "sides of it up where" he picked down the loose rock, which was to the west, it is manifest from his own testimony that he neither sounded nor otherwise examined or inspected the projecting ground or ledge itself on Saturday. In picking into the tunnel some waste came down. The plaintiff had orders from the day shift-boss not to permit any waste to go into the chutes, which contained ore. He told his helper, who was standing on the floor below, to pull up two pieces of lagging from that floor and put it behind the stringers, as the plaintiff intended to throw waste down. The helper did as he was directed. The plaintiff then took a stone from the pile of dirt, carried it to the east chute, and dropped it down between the hanging wall and the lagged stringers. When he dropped the stone he was standing by the ledge. The stone knocked the top lagging out of place. Stooping, the plaintiff got down on his knee to replace the lagging; in doing so he put his body immediately under the ledge, and reached down behind the stringer. As he arose, part of the ledge fell upon

him, causing the injuries of which he complains. · Had the ledge been supported, or spragged, he would have known the ground was loose or unsafe; not being spragged or braced, he thought it was just as he had left it on Friday. After the accident two or three pieces of lagging on the top floor under the ledge were removed, and five or six holes were to be seen in the ledge. These had been properly bored. The plaintiff knew nothing of them. The ledge was afterwards brought down by blasting two of the holes.

The plaintiff contends that the inferences deducible from these assumed facts, which we have stated at considerable length in order that the conditions may be understood, were for the jury to draw, and that they were sufficient to justify a verdict for the plaintiff.

A servant tacitly agrees, by virtue of the contract of employment, to encounter and assume the ordinary risks incident to the service, one of which is the negligence of his fellow-servants. In the case at bar the plaintiff and Running were fellow-servants in the employ of the defendant. But it is contended that because the plaintiff relied upon the defendant's unkept promise to discharge Running for negligence and unfitness, the defendant assumed the risk and hazard of Running's negligence which might thereafter cause injury to the plaintiff, and became answerable for such negligence to the same extent as it would be had the negligence been its own. For present purposes this may be granted, and it may be granted also that Running was negligent, and that without his negligence in boring six holes and leaving the ledge unsupported, the plaintiff would not have been hurt. Assuming all this to be true, we are nevertheless of the opinion that the defense of contributory negligence was conclusively made out by the evidence of the plaintiff. He, an underground miner of many years' experience, following a vocation dangerous to life and limb, and familiar with its risks, was engaged in making a place—a place which he was creating and changing as the work progressed. On Friday afternoon he blasted four holes in the center of the

raise over the man-way or middle chute; these holes were begun
about a foot from the ledge of rock overhanging the east chute,
which he sounded and found secure. He then went off shift,
leaving the top of the timbers open under the east chute. Now,
eliminate Running from the case, and consider the defendant
(the master) as a natural person, in Running's stead. The
defendant immediately took up the work, drilling and blasting.
In the ledge he bored six holes, when two would have an-
swered; this, we assume, was negligence. He failed to blast
them or to sprag or support the ledge after the drilling; this,
we assume, was also negligence. Next morning, after the de-
fendant had been at work all night, the plaintiff returned to
resume his work in the same place. Standing on the lower
floor and looking up to see what ground had been blasted, he
found the face of the raise, including the ledge over the east
chute, entirely hidden from view by lagging across the top of
the timbers and the usual way of access barred. He knew the
invariable custom was to lag under the ground blasted, and to
leave the timbers open on the side not blasted or about to be
blasted. He knew that drilling preceded blasting, and knew,
or was bound to know, either that the ledge over the east chute
had been blasted or was in condition to be blasted. The lag-
ging was equivalent to express notice by the defendant to the
plaintiff that the ledge was insecure,—it served the purpose
of a sign stretched across the ledge, declaring that in the pro-
gress of mining the ground had been shaken or rendered loose.
It was unmistakable notice and warning to the plaintiff of the
risk and danger,—*res ipsa loquebatur*. He found there was
no way to reach the upper floor except through a space three
feet wide between the stringers and the hanging-wall. This
unusual mode of access and ingress he used, climbed over the
girders and so got on the top of the floor. He knew that blast-
ing had been done on the afternoon before; he knew that within
two hours there had been further drilling and blasting, and he
was the first man to go into the place thereafter. His first
duty was to pick down the loose rock and inspect carefully the

ground to ascertain whether it was secure. He picked down all the rock that seemed to be loose and made some soundings of the walls. The ledge he did not sound, examine or inspect, though he could easily have done so. This he omitted because it looked solid and in the same condition it was on the afternoon of Friday. He gave it a glance, and as it was spragged and supported, he thought it secure. It reached from wall to wall, overhanging the east chute three or four feet and stood three feet above it. Under it on the lagging he saw dirt. He got under it by stooping and kneeling; as he was in the act of rising, part of the ledge fell upon his body. Now, the plaintiff was bound, at his peril, to use ordinary care,—that is, such care and caution as men of common prudence, possessing his knowledge and experience, in the particular vocation, would or should have exercised if placed in the position of the plaintiff at the time of the accident. Extraordinary care was not required of him; but the slightest want of ordinary care on his part was negligence which, if it contributed directly to the injury, defeats the action. The plaintiff cannot recover if he could have avoided the injury by exercising ordinary care and caution. That he may not have understood the danger, or may have temporarily forgotten the risk, is of no moment; he was charged with knowledge and understanding of such dangers and risks as he might have comprehended and appreciated by using ordinary care; if he forgot, he was negligent, for he was bound to remember. The defendant was not required to take better care of the plaintiff than the plaintiff was of himself; the measure of the duty of each was ordinary care. The negligence of the defendant did not dispense with the necessity of the plaintiff's using ordinary care. Such has been the unbroken rule since *Butterfield* v. *Forrester,* 11 East, 60, was decided, to the present day. By his own careless act in getting under the ledge without inspecting or sounding it, he voluntarily exposed himself to the risk of injury. The accident would not have happened had the plaintiff exercised due care and caution. His

failure in that respect was an immediate cause of the injury. Could a jury rightly declare that an average man of common prudence, similarly situated, would have acted as the plaintiff did? Did not the evidence so manifestly disclose the plaintiff's negligence that a verdict for him would necessarily have to be vacated on motion for a new trial? In proving the circumstances of the accident and injury, he succeeded in establishing for his adversary the defense of contributory, or concurrent negligence. The evidence left no substantial doubt upon the subject; the average reasonable man, not biased by sympathy with the plaintiff nor prejudiced by interest could come, upon deliberation, to but one conclusion. A nonsuit was therefore properly granted. We are aware of the rule that the question whether this defense has been made out is usually for the jury to decide. The case at bar is clearly one of the exceptions.

All the specifications of error are disposed of by the foregoing considerations. Let the judgment be affirmed.

*Affirmed.*