AWBERY, APPELLANT, *v.* SCHMIDT, RESPONDENT.

(No. 4,904.)

(Submitted September 16, 1922. Decided December 11, 1922.)

[211 Pac. 346.]

*Contracts—Real Property—Broker's Commissions—Statute of Frauds—Complaint—Quantum Meruit — Insufficiency — Appeal—Presumptions—Nonsuit.*

Appeal—Complaint—When Deemed Sufficient.
 1. If the complaint, or a cause of action stated therein, states a cause of action on any theory it will be sustained.

Assignment—*Quantum Meruit*—Complaint—Insufficiency.
 2. In an action to recover on a *quantum meruit* for the value of a land option contract assigned by plaintiff to defendant the complaint *held* fatally defective in the absence of allegation that the assignment was made at defendant's special instance and request and of one setting forth the reasonable value of the option.

Appeal—Complaint—Insufficiency—Demurrer—Presumptions.
 3. Where the complaint was attacked by general demurrer which was sustained, it will be presumed on appeal that the pleader stated his cause of action as strongly as he could.

Option Contracts—Real Property—Broker's Commissions—Evidence—Insufficiency.
 4. In an action to recover a broker's commissions under an alleged agreement whereby plaintiff assigned an option contract for the purchase of lands to defendant, the latter agreeing that if plaintiff should find a buyer within a given time ready, willing and able to

[65 Mont. 265.]

buy the land at a price fixed, the net profit should be equally divided between the two, plaintiff's evidence _held_ insufficient to show that he produced such a buyer and that therefore judgment of nonsuit was proper.

Appeal—Judgment of Nonsuit—How Plaintiff's Testimony Viewed.

5. On appeal from a judgment of nonsuit the testimony must be viewed in the light most favorable to plaintiff and as establishing every material fact which it tends to prove.

Contracts—Statute of Frauds.

6. An 'agreement to be performed within one' year need not be in writing.

Option Contracts—Real Property—Statute of Frauds.

7. The holder of an option to purchase land acquires nothing more than a personal privilege to purchase which does not ripen into an interest in the land itself until the privilege is exercised; hence where the optionee assigned his right to another and entered into an agreement with him whereby he (the assignor) was to find a buyer in consideration of half the profits realized on the sale, his engagement was to perform a service which could lawfully be made orally.

_Appeals from District Court, Fergus County; Roy E. Ayers, Judge._

ACTION by James Awbery against A. J. Schmidt. From a judgment of nonsuit and an order denying a motion for new trial, plaintiff appeals. Affirmed.

_Messrs. Cheadle & Cheadle_ and _Mr. Rufus Hopkins,_ for Appellant, submitted a brief; _Mr. E. K. Cheadle_ argued the cause orally.

_Messrs. Belden & De Kalb,_ for Respondent, submitted a brief; _Mr. H. Leonard De Kalb_ argued the cause orally.

The pleading and the proof indicate that the arrangement was one whereby an agent, to-wit, the plaintiff, was appointed to make a sale of real estate for a compensation or commission. This our statute of frauds requires to be in writing, and it makes no difference whether or not the contract was performed, for the courts have uniformly held that although a purchaser has been found and a sale consummated, where the authority is oral, no recovery can be made.

---

7. Right of sale or assignment of option to purchase realty, see note in **Ann. Cas.** 1914B, 1228.

In *Gunn* v. *Bank of California,* 99 Cal. 349, 33 Pac. 1105, the rule is laid down so clearly that no authority is found anywhere criticising or altering it in any respect. We cite it as a leading case. It holds that a broker is not entitled to commission for having found a purchaser unless he introduces the customer to the owner, or takes a binding contract from the purchaser. We direct the court's attention to the rule of law applying to contracts falling within the prohibition of the statute of frauds. Thus, in 20 Cyc. 285, it is said: "If part of an oral contract falling within the scope of the statute of frauds is in violation of the statute, the whole contract, if it is entire and indivisible, is unenforceable." (See, also, *Fuller* v. *Reed,* 38 Cal. 99.) The provisions of the statute of frauds can be invoked under a simple denial of the contract in the answer. (*Mitchell* v. *Henderson,* 37 Mont. 515, 97 Pac. 942; *Dunphy* v. *Ryan,* 116 U. S. 491, 29 L. Ed. 703, 6 Sup. Ct. Rep. 486 [see, also, Rose's U. S. Notes].) This court has fully decided this case in the case of *Largey* v. *Leggat,* 30 Mont. 148, 75 Pac. 950, where it holds that an oral agreement by a purchaser at a judicial sale to take the deed in his own name and convey to another is void as within the statute of frauds. In every respect that decision determines the case at bar. The allegations are that Schmidt was to purchase the property, hold it, and convey it to whomsoever plaintiff directed. This agreement was absolutely void. Even though it was contended that the contract related to the disposition of the proceeds of a resale, it is void because not in writing. The courts have never permitted any recovery until after the land had actually been resold. They have uniformly held that a resale cannot be compelled; nor can any damages or commissions be recovered for a failure or refusal to make a resale. (*Collar* v. *Collar,* 86 Mich. 507, 13 L. R. A. 621, 49 N. W. 551; *Gee* v. *Thrailkill,* 45 Kan. 173, 25 Pac. 588.) The utmost extent to which the rule goes is well stated in 25 R. C. L. 130, where it is said: "Thus, where one conveys land to another under a verbal agreement that he will sell it and pay over the proceeds to the grantor, it is held that though the grantor

cannot on account of the statute enforce the grantee's agreement to resell, yet, after a resale has been made, he may compel him to account for the proceeds.''

MR. JUSTICE GALEN delivered the opinion of the court.

An examination of the record discloses that this is a companion case to that of *Kramer* v. *Schmidt*, 62 Mont. 568, 206 Pac. 620. Both arise out of the same transactions. In this case the plaintiff in his complaint predicates his right of recovery on two causes of action, *viz.*: First, on a contract alleged, whereby the plaintiff assigned and transferred to the defendant a certain option contract for the sale of lands belonging to one John Bain, comprising 3,600 acres, at the price of $20 per acre, the defendant agreeing that if the plaintiff should, within twelve months from the date of the assignment, find a purchaser of the lands ready, able and willing to purchase the same at $25 per acre, the defendant would accept such price, cause the lands to be conveyed to such purchaser, and share equally with the plaintiff the net profit on the sale so made; that the plaintiff within the time limited did find a purchaser ready, able and willing to buy the land for the sum of $25 per acre, but that the defendant refused to sell the lands to the prospective purchaser at such price, and in consequence the plaintiff claims as damages commission from the defendant of one-half the profits which would have accrued on a sale of the land, amounting to $9,000.

The second cause of action is an attempt to plead a *quantum meruit* for the value of the option contract assigned to the defendant.

A general demurrer was interposed to both causes of action, which was by the court overruled as to the first cause of action, and sustained as to the second cause of action. In his answer the defendant denies the agreement alleged by the plaintiff and affirmatively pleads the statute of frauds in bar. The cause was tried to the court without a jury, and at the conclusion of plaintiff's case the defendant moved ''for a nonsuit''; the court reserving its ruling thereon. At the con-

clusion of all the testimony the case was briefed and argued by counsel for the respective parties, and thereafter the court ordered "judgment to be entered herein for nonsuit and for costs and disbursements herein expended by the defendant." Judgment was entered accordingly, and the case is now before us on appeal from the judgment and from an order denying plaintiff's motion for a new trial.

As we view the case from the record, there are but three questions necessary to be considered, *viz.:* (1) Did the court err in sustaining the demurrer to plaintiff's second cause of action; (2) does the evidence sufficiently establish the contract upon which plaintiff predicates his first cause of action, and breach thereof by the defendant; and (3) does the contract come within the statute of frauds?

1. If the complaint or a cause of action pleaded therein [1] states a cause of action on any theory, it will be sustained. (*Merk* v. *Bowery Min. Co.,* 31 Mont. 298, 78 Pac. 519; *Donovan* v. *McDevitt,* 36 Mont. 61, 92 Pac. 49; *Raymond* v. *Blancgrass,* 36 Mont. 449, 15 L. R. A. (n. s.) 976, 93 Pac. 648; *Cassidy* v. *Slemons & Booth,* 41 Mont. 426, 109 Pac. 976; *Stadler* v. *City of Helena,* 46 Mont. 128, 127 Pac. 454; *Hicks* v. *Rupp,* 49 Mont. 40, 140 Pac. 97; *Decker* v. *Decker,* 56 Mont. 338, 185 Pac. 168; *Wing* v. *Brasher,* 59 Mont. 10, 194 Pac. 1106; *Kirkup* v. *Anaconda Amusement Co.,* 59 Mont. 469, 17 A. L. R. 441, 197 Pac. 1005.)

But in this instance the second cause of action attempted to [2] be pleaded falls short of stating a cause of action in essential particulars, and in our opinion the court was correct in sustaining the demurrer thereto. It is alleged merely that the "plaintiff sold, assigned, and set over to the said defendant his said option contract, * * * that in pursuance and by virtue of the said option contract the said defendant thereupon and thereafter purchased the said tract of land from the said Julius Bain, and paid him therefor the sum of $72,000, the price expressed in the said option contract, and "that the reasonable price to be paid to this plaintiff for the assignment of the said option contract * * * was the sum of

$9,000.'' These allegations do not state a cause of action against the defendant, first, in that there is no allegation that the assignment was made to the defendant at his special instance or request; and, second, there is no allegation as to the reasonable value of the option assigned. All of the facts pleaded may be entirely true, and yet no responsibility attach [3] to the defendant. The court will indulge the presumption that the plaintiff has stated his cause of action as strongly as he can, and in a case of this character the complaint is clearly insufficient without allegation that the assignment was made at the request of the defendant. (*Conrad Nat. Bank* v. *Great Northern Ry. Co.*, 24 Mont. 178, 61 Pac. 1.)

2. We have carefully examined and reviewed all of the evidence, and therefrom conclude that the district court [4] was right in ordering judgment in favor of the defendant. The proof falls short of showing a breach of contract. The agreement is satisfactorily shown, but the evidence does not sufficiently establish that the plaintiff did in fact secure a purchaser of the land ready, able and willing to buy the same at the agreed price of $25 per acre. On this phase of the case, plaintiff's cause of action must stand or fall upon the testimony of John J. Willis, he being the alleged purchaser of the lands procured by the plaintiff in fulfillment of his part of the agreement. His testimony is very unsatisfactory and contradictory, and, were we to base our decision on isolated statements in his testimony, decision could be reached either in favor of or against the plaintiff, on the question as to whether he in fact procured a purchaser ready, able and willing to buy the land.

Mr. Willis testified: "Q. Did you have any conversation with Mr. Awbery, perhaps in the month of May, 1917, about buying the Julius Bain ranch? A. Yes, sir. Q. And what was that conversation between you and him? A. Well, we started over there to look at it once; I wanted to go and see it, and he priced it at $25 an acre, and I was going to interest my father and uncle in it, if it was what he represented it, and the car broke down about two or three miles from Geyser, and

[65 Mont. 265.]

it was raining, and we hiked into town, couldn't get a part for the car, and I and a Colorado man that was with them going over on the same trip, we came back to town. Q. Had you had dealings prior to this time with Awbery? A. Well, we had bought one ranch together, yes. Q. Did you have confidence in his judgment respecting land? A. Why, yes, I give Mr. Awbery credit for knowing land; yes, sir—bought several places. Q. What was your intention with reference to this land? A. Well, I was out to buy it if I could. Q. Your father and uncle had sufficient means? A. Yes, sir. Q. And what directions or authority had you from them, or either of them? They were to furnish the money? A. Not all of it. I was to furnish some. Q. You had some yourself, did you, Mr. Willis? A. Certainly did. Q. And about what means did you have yourself at the time? A. I had $10,000 or $12,000 of my own. Q. Ten or twelve thousand of your own; and where did you expect to get the remainder of it? A. From them. Q. From whom. A. Father or uncle. They both wrote me about— Q. Have you the letters? A. No, sir. Q. Do you remember the contents? A. Well, only in regards if I found a good buy out here—

"By the Court: Do you remember them? A. Yes, sir; that is, to a certain extent.

"By the Court: You may go ahead. A. Well, if I found a good buy, any lands—in any lands—to let them know, that they were willing to invest. Q. They were willing to? And was it your intention to buy this land at that price of $25 an acre? A. I considered it a good buy according to what Mr. Awbery said. Q. Well, was it your intention to buy it? A. Yes, sir."

On cross-examination he said: "Q. And it was your purpose, of course, before you put any money into that, to see what you were buying, as a cautious land buyer? A. I did, yes; but the car broke down. I don't know how it would have been after that. I agreed to sign up for it for $25 after that. Q. You told Mr. Awbery, just as he stated here, that you would like to take an option on it for a few days? A. Yes,

sir; I did. Q. And that you figured would give you an op-
portunity to further investigate, didn't it? A. Yes, sir. Q.
And at that time you had $10,000 or $12,000 you could have
put into the property? A. Yes, sir. Q. And you figured that
you might get the rest of the money from your father and
uncle? A. I didn't think that there was any might about it;
I knew it. Q. How is that? A. I didn't figure that there was
any might about it; I knew I could get it. Q. Well, you had
just the assurance from them that they were interested in
making an investment if you found what was considered a
good buy? A. They were leaving it to my judgment. Q.
How? A. They were leaving it to my judgment. Q. Well,
how much money could you have gotten from them? A. Well,
enough to pay all cash for that place, I believe. Q. How is
that? A. Enough to pay all cash for that place, I believe, and
probably some left over. Q. Of course, when Mr. Awbery
came to you and told you that the deal was off, that he could
not get it for $25 an acre, you didn't go out then and look at
the land, did you? A. No, sir; I bought another place. Q.
You bought another place? But it was your purpose, of
course, to go out and look at it before you bought? A. Well,
that was my intention when I started over the first time.
Q. And you didn't—didn't know anything about the condition
of the title? A. No, sir. Q. Would you have bought it if the
title to any portion of the land had failed? A. Well, I don't
know about that, according to how bad it failed, or what it
was. Q. Well, you had not any discussion in regard to the title
of the land with anybody? A. I knew nothing about the title
of the land, or nothing about— Q. You would not have bought
it if the title were bad to any portion, would you? A. Well,
nobody would buy it if the title was bad. Q. Well, do you
know now that a certain portion of that title failed to get
by the scrutiny of the government agents? A. I never knew
it until to-day. Q. You found that out to-day? A. Yes, sir.
Q. Of course, that would have made some difference with
your deal, wouldn't it? A. Been according to how big a part
of it it was, or something like that. Q. Well, you couldn't

say now that you would have been in a mind to purchase that without knowing exactly what that title disclosed on examination, would you? A. No, sir; I couldn't say that I would have bought it without knowing about it. Q. You would not buy anything until you had thoroughly investigated both the character of the land and the title of the land? A. Well, I would have the title investigated anyhow,''

On redirect examination, he testified: "Q. Mr. Willis, if it turned out that the title to 160 acres was defective, and that you would not have had to pay for that, and could have paid $25 for the rest of the ranch, would that have made any difference to you? A. What was the question? Q. If it turned out that there was a defective part, a defect in a small portion of it, 160 acres, for example, and you would not have had to take that, would you have been willing to pay $25 for the rest of it? A. I don't think that would stop the deal at all. Q. You were willing to buy on Awbery's representation, were you not? A. Well, I have bought a lot of it on his representation. Q. Well, were you at that time? A. Yes, sir.''

And on recross-examination: "Q. Well, at the present moment you do not recall whether or not you were willing to buy it or not, until you had seen it? A. Well, I couldn't say for sure whether I was going to buy it without seeing it or not; but I made one trip over there, and we broke down, and I was disgusted, and I wanted an option on it. I was willing to pay $25 an acre for it on his say-so.''

Viewing this testimony in the light most favorable to the [5] plaintiff, and as establishing every material fact which it tends to prove, as we must (*Cummings* v. *Helena & Livingston Smelting & Reduction Co.*, 26 Mont. 434, 68 Pac. 852; *Stewart* v. *Stone & Webster Engineering Corp.*, 44 Mont. 160, 119 Pac. 568; *Lackman* v. *Simpson*, 46 Mont. 518, 129 Pac. 325), it cannot be said that the plaintiff produced a buyer for the lands ready, able and willing to purchase the same unconditionally.

3. The statute of frauds has no application in this case, as [6, 7] the agreement alleged was one to be performed within

one year, and it is not an agreement authorizing or employing an agent or broker to purchase or sell real estate within the meaning of section 7519 of the Revised Codes of Montana of 1921, but rather an oral contract to divide commission on the sale of the lands covered by the written option contract from Bain to Awbery. The plaintiff did not contract to sell real estate to the defendant, but rather assigned his right to make purchase of real estate under an option contract, and, as the contract between the plaintiff and the defendant was to be performed within a year, no writing was necessary. (*Ide* v. *Leiser,* 10 Mont. 5, 24 Am. St. Rep. 17, 24 Pac. 695; *Winslow* v. *Dundom,* 46 Mont. 71, 125 Pac. 136; *Kramer* v. *Schmidt,* 62 Mont. 568, 206 Pac. 620.)

In the case last cited, Mr. Chief Justice Brantly, speaking for this court, after quoting the definition of an option contract for the purchase of real estate from the case of *Ide* v. *Leiser, supra,* well said with respect to the very same transaction here involved: ''Under this definition the holder of the option is not vested with any interest in the land, but, as said by Mr. Justice DeWitt, he gets *'in praesenti,* not lands, or an agreement that he shall have lands, but he does get something of value, that is, the right to call for and receive lands as he elects.' The doctrine announced in this case has been approved by this court in later cases. (*Snider* v. *Yarbrough,* 43 Mont. 203, 115 Pac. 411; *Winslow* v. *Dundom,* 46 Mont. 71, 125 Pac. 136; *Tyler* v. *Tyler,* 50 Mont. 65, 144 Pac. 1090.) The holder of the option, then, acquires nothing but a personal privilege to purchase, which does not ripen into an interest in the land until he chooses to exercise the privilege conferred by the option, and complies with the terms upon which he obtained it. So it is held by the authorities generally, from a number of which, found in the brief of counsel, we cite the following: James on Option Contracts, sec. 502; *Richardson* v. *Hardwick,* 106 U. S. 252, 27 L. Ed. 145, 1 Sup. Ct. Rep. 213 [see, also, Rose's U. S. Notes]; *Benedict* v. *Pincus,* 191 N. Y. 377, 84 N. E. 284; *Thacher* v. *Weston,* 197 Mass. 143, 83 N. E. 360; *Patterson* v. *Farmington St. Ry. Co.,* 76 Conn. 628, 57 Atl. 853; *Verstine*

v. *Yeancy,* 210 Pa. 109, 59 Atl. 689. Awbery having acquired no interest in the land, but a mere personal privilege which he could lawfully assign to the defendant (*Winslow* v. *Dundom, supra*), the agreement between the plaintiff and the defendant did not amount to an employment of the former as a broker or agent to buy land or an interest in land which by the statute is required to be in writing, but to an engagement by him to perform a service which could be lawfully made by oral contract."

The judgment and order are affirmed.

*Affirmed.*

Associate Justices Cooper, Farr and Holloway concur.