WESTERDALE, Respondent, v. NORTHERN PACIFIC RAILWAY CO. et al., Appellants.

SCHNIDER, Respondent, v. NORTHERN PACIFIC RAILWAY CO. et al., Appellants.

(No. 6,356.)

(Submitted January 9, 1929. Decided January 21, 1929.)

[273 Pac. 1051.]

*Mr. W. S. Hartman* and *Messrs. Gunn, Rasch & Hall,* for Appellants, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

4

*Mr. H. D. Bath* and *Mr. E. F. Bunker*, for Respondents, submitted a brief; *Mr. Bunker* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

On June 15, 1927, Lyle Westerdale and Alfred Schnider, both then of the age of seventeen years, were riding in a Ford automobile driven by the former on a public highway about two and one-half miles east of Bozeman, Montana. As the automobile was crossing the railroad tracks of the defendant company at what is known as the Fort Ellis crossing, it was struck by an engine of the defendant company, operated by the defendant Magnuson as engineer. The Westerdale boy was killed and the Schnider boy seriously injured. Andrew Westerdale, father of Lyle Westerdale, brought action to recover damages for the death of his son, and Anna Schnider, as guardian *ad litem* for Alfred Schnider, brought action for the injuries sustained by Alfred Schnider. The actions were tried together before the same jury and (save on the issue of

6

damages) on the same evidence. The jury returned a verdict in favor of plaintiff in the Westerdale case in the sum of $2,165, and in favor of plaintiff in the Schnider case in the sum of $3,000. From the judgments entered on the verdicts these appeals were taken.

The complaint in each action predicated liability upon the negligence of the defendants in failing to sound the whistle or ring the bell on the engine upon approaching the crossing, upon their failure to use reasonable care to observe the automobile approaching the crossing and upon their failure to use reasonable care in stopping the engine in time to avert the death and injuries after striking the automobile. After all of the evidence had been introduced, upon request of the defendants the court withdrew from the consideration of the jury the question of negligence in failing to sound the whistle and ring the bell, and that of failing to use proper care to see the approaching automobile before it was struck by the engine. The cases were submitted to the jury upon the sole remaining question whether the defendants used reasonable care, under the last clear chance doctrine, to avoid the death and injuries after discovering the boys in their perilous position.

The court in its instructions limited the jury to a consideration of the following questions: ''1. Could the engineer, after he actually discovered the boys in a perilous position upon the track, in the exercise of ordinary care, have stopped his engine in time to have avoided injuring them, but carelessly and negligently failed so to do; and 2. When were the injuries sustained by the boys actually received by them?''

It is contended by defendants that there was not sufficient evidence to sustain the verdicts in favor of plaintiffs on the issues thus limited and that the verdicts rendered were the result of surmise and conjecture. This question was raised by a motion for nonsuit at the close of the evidence on behalf of plaintiffs, and by a motion for a directed verdict and for dismissal after all of the evidence had been introduced.

The evidence relied upon by plaintiffs to sustain the verdicts must, under such motions as the above, be construed in the light most favorable to plaintiffs, and every fact must be deemed established which the evidence tends to prove. (*Robinson* v. *Woolworth Co.*, 80 Mont. 431, 261 Pac. 253; *Puutio* v. *Roman*, 76 Mont. 105, 245 Pac. 523; *Grover* v. *Hines*, 66 Mont. 230, 213 Pac. 250; *Awbery* v. *Schmidt*, 65 Mont. 265, 211 Pac. 346.)

The record discloses that at the time of the collision the engine was moving backward down a one per cent grade in a westerly direction and that the public highway ran parallel with, and on the north side of, the railroad for a considerable distance east of the crossing and at the crossing in question it crossed the railroad track at right angles. The speed of the engine before the collision, as estimated by plaintiffs' witness, George Boylan, who observed it from a distance of about 130 feet, was about eighteen or twenty miles per hour. Mrs. Frances Collins, a witness for plaintiffs, who saw the engine from her house a little more than 500 feet from the crossing, estimated the speed of the engine after it had gone about 300 feet west of the crossing, as about fifteen or sixteen or maybe twenty miles an hour. The engineer, Magnuson, testified: "I observed the automobile the minute it came across the crossing back of the tender, and saw that it was not over six feet from the end of the tank." The engine ran about 640 feet west of the crossing before it came to a stop.

To prove that the engineer did not use reasonable care to stop the engine after seeing the automobile and appreciating the peril of the occupants, the plaintiffs introduced the following testimony: The witness George Boylan testified that the engine retained its same speed after the collision and did not start to slow up until it got 200 or 300 feet down the track west of the crossing. This was corroborated by the testimony of Mrs. Frances Collins, who estimated the speed of the engine at a point about 300 feet west of the crossing as about the same as the speed was estimated by George Boylan

before the collision. She also testified that she heard the brakes applied after the engine had passed the crossing more than 300 feet.

The witness F. J. Collins, who lived about 500 feet from the scene of the accident, testified: "The second morning, I think, after this accident happened I had occasion to observe the railway company testing out an engine of this type, or this same engine, as to its ability to stop at that particular place. At 4 o'clock in the morning I had occasion to get up and see one of those light engines backing down the track in the same way as that engine that had the accident. I would say it was coming down there anyway at twenty-five miles an hour. Just as it got to where that wreck was rolled off, I heard the brakes go on and saw it stop right then. I do not think it went the length of the engine and tender, perhaps about thirty feet."

Harry A. Harding, who resided about a quarter of a mile from this crossing, testified: "In the afternoon a few days after the accident the helper that had helped No. 2 up the hill came down the hill at full speed—I do not know what they run there, but they were probably going from twenty-five to thirty miles an hour—and when it got to the crossing, the power was shut off and it stopped approximately one hundred feet west of the crossing. The engine was a regular helper engine of the same type as the one in the accident."

John D. Huffine, an experienced railroad engineer, testified that he was familiar with and had run the type of engine known as the W-type, 1516, the same being the type used at the time of the collision in question. He also testified: "Assuming that the day was clear and that no storm or anything had occurred to obstruct the travel of the engine on the rails, that this type of engine was backing down the track and approaching the crossing known as the Fort Ellis crossing at approximately twenty miles an hour, that it was equipped with what is known as intermediate sanders—backup sanders—I would say that with sand under the two front drivers the

engine could have stopped in the case of an emergency, within two hundred feet or less."

The weight of this evidence was for the jury to determine. It was sufficient to justify the court in submitting to the jury the question whether the engineer used reasonable care, under the circumstances, to stop the engine after discovering the automobile. It is true that the defendant Magnuson, as well as other witnesses for the defendants, testified that every reasonable precaution was taken to stop the engine as soon as possible after the collision, and that the stop within 640 feet was as quick a stop as could have been made. But the evidence as a whole on the issue as to whether the engineer used reasonable care in stopping the engine is in substantial conflict, and in such cases the result reached by the jury will not be disturbed on appeal.

The next question, and one more difficult of solution, is: Was defendants' negligence in failing to stop the engine sooner responsible for the injuries of the one boy and the death of the other? In other words, was there any substantial evidence showing, or tending to show, that the injuries and death were caused by failure to stop the engine sooner? The answer to this question depends upon when the injuries were received.

The only evidence bearing upon this question is indirect or circumstantial. Actionable negligence may be proved by indirect or circumstantial evidence when the circumstances tend "to prove the efficient proximate cause relied upon" and also tend to exclude any other. (*Fisher* v. *Butte Electric Ry. Co.*, 72 Mont. 594, 235 Pac. 330.) The circumstances relied upon by plaintiffs, from which they contend the jury was justified in drawing the inference that the injuries were not received at the time of the impact but as a result of the act of the engineer in not stopping the engine sooner, may be summarized as follows: When the automobile was struck by the engine it became lodged in some manner on the step of the tender and was carried along the track for a distance of more than 400 feet without any injury or marks on the railroad

ties, while during the last 100 or 150 feet the ties were badly torn and splintered. The slats between the rails constituting a part of the cattle-guard which was situated fifteen or twenty feet west of the crossing, were torn out and dragged about 150 feet, but there was no injury to the ties, except for the last 100 or 150 feet. For the last 100 feet that the engine traveled, the cinders along the track had been torn up, but for the first 500 feet after the collision they were only lightly marked or scratched. A cloud of dust was raised at the time of the collision, which made it impossible for anyone to see what was happening to the boys in the automobile. When the engine was stopped, the side of the automobile nearest the engine was wedged between the drawbar of the tender and the top of the rails or the ground, and the opposite side was tipped up so that the wheels were off the ground. That part of the car from the windshield to the rear was badly demolished. The tops of the seats were crushed into the floor of the automobile. The clothing on the boys was torn and indicated that they had been dragged. The shirt of the Schnider boy was up around his chest. The injuries inflicted upon them were in the main on the right side of their bodies, though the left side was the side exposed to the engine at the time of the impact. The right leg and both collar bones of the Westerdale boy were broken. He also had an injury on the left side of his head. There were marks upon his chest and on his back and numerous scratches and abrasions on his arms, legs and face. The Schnider boy was also scratched on the face, hands, arms and other parts of his body. His nose and upper jaw were broken and there were cuts on the right side of his head and a cut on his lip. The Schnider boy was unconscious and remained so for several days after the accident. He was called as a witness but did not remember a thing that happened on the day of the accident after he got into the automobile at a point about three-quarters of a mile east of the crossing where the boys had been fishing. After the engine came to a stop the boys were seen lying side by side south of

the track about forty feet east of the engine where they had been thrown; both were unconscious. The Westerdale boy died shortly after reaching the hospital. The faces and hands of the boys were scratched and covered with coal dust and their clothing was covered with cinders. The record is silent as to whether there were any blood stains along the track or on the automobile.

Dr. Blair, who treated the boys immediately after the collision, stated that the cinders and coal dust upon the clothing, faces and hands of the boys might indicate that they had been dragged or suddenly thrown out. He further testified that if the engine struck the automobile while backing at a speed of twenty-five miles an hour, that kind of an impact or blow, in his opinion, probably produced the fractures and injuries that he found upon the boys; but whether Dr. Blair would have been of the same opinion had the engine been moving at only eighteen or twenty miles per hour, as testified to by some of plaintiffs' witnesses, does not appear.

It is the contention of defendants that it is contrary to all experience that the boys were not, under the circumstances, injured by and at the time of the impact. A somewhat similar case was that of *Louisville & N. R. Co.* v. *Benke's Admr.*, 176 Ky. 259, 195 S. W. 417, where the court held that a sufficient showing was made to submit the case to the jury on the last clear chance doctrine. In that case the deceased was struck by a train and carried on the cowcatcher for 150 feet, then fell off and run over by the engine; a witness standing near the scene of the accident testified that after the impact she saw deceased on the cowcatcher and that deceased was then alive and had a terrified look upon her face.

In *Payne, Director-General*, v. *Healey*, 139 Md. 86, 114 Atl. 693, a judgment for personal injuries and damages to an automobile was affirmed where an engine picked up the automobile at a crossing and carried it over 300 feet until it collided with a semaphore.

In *Green* v. *Metropolitan Street Ry. Co.*, 65 App. Div. 54, 72 N. Y. Supp. 524, the plaintiff was struck by a cable car, probably through his own contributory negligence. There was evidence tending to show that after plaintiff was struck and before he was run over, his body was resting against or upon the fender of the car; that the car traveled nearly 100 feet before it stopped; that it could have been stopped within twenty-five or thirty-five feet, and that plaintiff was thrown from the fender by the jolting of the car and run over. In sustaining the verdict and judgment, the court said: "It cannot be said that there is no evidence to support the verdict, or that the account of the accident as given by the plaintiff involves an impossibility. It is true that the construction of the car and the situation of the fender would render it seemingly unlikely that, after being struck, the plaintiff's body could have been caught upon this fender, and remain there for any length of time; but the evidence is that such was the fact, and, although such a thing may never have occurred before within the experience of any one connected with the road, nevertheless it cannot be pronounced impossible, in view of the evidence appearing in the record."

In *Citizens' Street Ry. Co.* v. *Hamer*, 29 Ind. App. 426, 62 N. E. 658, 63 N. E. 778, the plaintiff was struck by a car and carried by it the greater part of 100 feet, when his leg was cut off, as shown by marks on the rail; the car could have been stopped in less than thirty feet. A judgment for plaintiff was affirmed.

The above-cited cases but illustrate the theory upon which the cases before us were tried. In each of them there was evidence that the injury or death was caused after the engine or car had traveled farther than it should have, had the operator used reasonable care to stop it. The facts and circumstances in the present cases were sufficient to warrant the court in submitting the cases to the jury and to sustain the verdicts for plaintiffs. As stated, when the boys were picked up after the engine stopped they were unconscious. Whether, had they

been injured to such an extent as to render them unconscious at the time of the impact, they would have been able to have retained their position in the automobile, jolted and jarred as it must have been for 600 feet, was a question for the jury to determine. The jury was justified under all of the facts in the cases, taking into consideration the nature of the injuries, the manner in which the car was carried by the engine, the circumstances that the boys retained their position in or on the automobile while it was being pushed 600 feet, the condition of the clothing of the boys, and the direct proof that they appeared to have been dragged, in concluding that they received the injuries complained of, resulting in the death of one of them, after the engine had traveled beyond the point where plaintiffs' witnesses testified it could have been stopped rather than at the time of the impact. The circumstances in the instant cases present as strong a case for the jury as those held sufficient to support the verdict in *Jenkins* v. *Northern Pac. Ry. Co.*, 44 Mont. 295, 119 Pac. 794.

Defendants also assign error on the refusal of the court to give their offered instruction numbered 5. By this offered instruction the defendants sought to advise the jury that before a recovery could be had, the plaintiffs were required to prove that the engineer knew that the boys were not seriously injured at the time of the impact and that they were still in the automobile after the impact. The action of the court in refusing to give this instruction was correct. The engineer saw the automobile as it moved on the track ahead of the engine. It was then his duty to act on the supposition that the car was occupied by someone. It will not do for him to say that he did not know whether the impact caused the occupants to be thrown from the automobile, nor will he be permitted to say that he did not know the boys were not seriously injured by the impact. He cannot be allowed under such circumstances to govern his conduct, with reference to the operation of the engine, by what he does not know.

This court will not lend its aid to the establishment of a rule that will encourage those in charge of the operation of engines to close their eyes and see as little as possible after colliding with a moving automobile. We hold that it was the duty of the engineer, as a matter of law, after seeing the automobile move upon the track and knowing that it was struck by the engine, to use reasonable care to stop the engine whether he actually knew that the automobile was occupied by a person, or not.

Counsel for defendants contend, also, that the verdicts are contrary to the law as given in instructions numbered 6, 7, 8 and 9. This contention questions the sufficiency of the evidence in the particulars already discussed, and for the reasons above stated, is without merit.

The judgments for the foregoing reasons are affirmed.

Mr. Chief Justice Callaway and Associate Justices Matthews, Galen and Ford concur.